## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00109 (TJK)** |
| **v.** | : | |
| | : | |
| **TAM DINH PHAM,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Tam Dinh Pham to 60 days' incarceration and $500 in restitution.

**I.      Introduction**

Tam Dinh Pham ("Defendant"), a senior Houston police officer at the time, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Defendant pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building, which carries a maximum term of incarceration of six months. As explained herein, a period of incarceration is appropriate in this case because (1) Defendant saw people trying to incite the police during the riot; (2) he walked past knocked-down fences and other barricades to make his way inside the U.S. Capitol; (3) while entering the Capitol, amid shouts of "It's our house now," he cheered, "We're taking the house back!, demonstrating he was not a mere "tourist"; (4) he spent approximately 20 minutes roaming

throughout the Capitol building, demonstrating he did not quickly abandon the unlawful trespass; (5) he penetrated the U.S. Capitol all the way to an area of offices, thereby increasing the risk that he would encounter persons who were lawfully inside the building, including Congressional staffers, which could have escalated into a confrontation; (6) he falsely downplayed his conduct to FBI agents by claiming that he just wanted to take pictures of the artwork inside the Capitol building; and (7) as an active Houston, Texas police officer with 18 years of experience, including experience of his own responding to demonstrations, he knew full well that entering the U.S. Capitol was unlawful, and that it had a potential for serious violence.

Defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed in its goal of delaying the certification of the Electoral College vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with his unique understanding of the potential for violence that day as a sworn law enforcement officer renders a significant sentence both necessary and appropriate.

**II.      Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid repetition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 22 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. Defendant's conduct was neither the least nor the most culpable of persons who have been convicted of violating 40 U.S.C. § 5104(e)(2)(G) for their conduct on January 6.   It was, however, serious enough to warrant a sentence of incarceration.

*Defendant's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Defendant traveled to Washington, D.C. from his home in Texas with his wife and her friend.  He later told agents that he attended the "Stop the Steal" rally on January 6 so that he could "see history."

After attending the former President's rally, Defendant followed the crowd walking toward the Capitol.  His wife and her friend did not follow.  Along the way, Defendant posed for a picture with a Trump flag across his shoulders with the Capitol in the background:



Defendant told agents that he posted that picture to Facebook but quickly deleted it.  Agents later found the picture in Defendant's "Deleted" album in his telephone.

Defendant took photos and videos as he walked toward the Capitol.  In one video, Defendant can be heard joining a chant of "Stop the steal" while standing on the West Plaza of the Capitol grounds just behind the police barrier:

**Exhibit 1[1]**
**(screenshot min 0:43)**



In another video taken by Defendant on the Capitol grounds, members of the crowd can be heard shouting, "storm the Bastille," "Justice for Trump," "tear gas" and "fight for Trump" while people appear to be visibly impacted by a chemical irritant in the air.  *See* Exhibit 2.[2]

---

[1] Exhibit 1 is a video being provided to the Court and Defendant in advance of the hearing.  The picture is a screen capture from that video.
[2] Exhibit 2 is a video being provided to the Court and Defendant in advance of the hearing.

At approximately 2:45 P.M., Defendant made entry into the U.S Capitol building through the Upper West Terrace door, a door that was plainly not intended for visitors, as stacks of cardboard boxes lined the walls, an alarm blared, and no metal detector or security checkpoint were present:



On the way in, Defendant took a video in which an alarm can be heard blaring and a member of the crowd shouted, "This is our house now!"  Defendant then turned the camera on himself and said, "We're taking the house back!"

**Exhibit 3[3]**
**(screenshot min 0:16)**



Once inside, Defendant walked up a flight of stairs, and entered the Rotunda where a large

crowd was present.

---

[3] Exhibit 3 is a video being provided to the Court and Defendant in advance of the hearing.  The
picture is a screen capture from that video.



While in the Rotunda, Defendant posed for photo in front of a statue of former President Gerald Ford in whose hands a flag had been placed that read, "TRUMP 2020 – NO MORE BULLSHIT":



After spending about seven minutes in the Rotunda, Defendant entered Statuary Hall. He then returned to the Rotunda and walked through a fire door into an office area with desks, a computer, and numerous paper files.  According to the Capitol Police, this area was part of the office suite of Congressman and House Leader Kevin McCarthy:





Defendant then doubled back through the fire door and returned to the lobby area outside the Rotunda:



He exited the building at approximately 3:05 PM, about 20 minutes after he entered.  Defendant admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to enter the building and that he paraded, demonstrated, or picketed.

*Defendant's Interview by the FBI*

On January 12, 2021, Defendant was voluntarily interviewed by FBI agents at his home in Richmond, Texas regarding his involvement in the events of January 6, 2021. During the interview, Defendant acknowledged he had been an officer of the Houston Police Department ("HPD") for approximately 18 years.[4]  Defendant told the agents that he was in Washington, D.C. from January 5–7, 2021 for business reasons.  PSR ¶  17.  He stated that he briefly attended President Trump's rally on January 6, 2021 but initially denied going to the Capitol building.  *Id*.

---

[4] In February 2021, Pham resigned from HPD.  PSR ¶ 49.

The agents asked Defendant if they could look at the pictures on his cell phone during the time he was in Washington, D.C., and Defendant agreed. PSR ¶ 17. As Defendant was showing the agents the photos, they noticed there were none for the dates that Defendant had traveled to Washington, D.C. *Id*. An agent asked Defendant if she could view his "deleted" photo album. Defendant agreed, and in that album, agents found dozens of photos and videos of the interior of the Capitol building and the Capitol grounds from January 6. *Id*.

An agent advised Defendant that it was unlawful for him to make false statements to the agents. In response, Defendant said he would tell the truth. He stated that he had traveled to Washington, D.C. from Houston on January 5, 2021 with his wife and her friend, and that they stayed for two nights. Defendant stated that they originally traveled to Washington, D.C. for his wife's cooking business, which happened to coincide with President Trump's rally. Defendant stated that he learned about the rally from Facebook and that he attended it to "see history." He stated that he was not associated with any social media groups that were promoting the rally. Defendant stated he did not travel with any weapons, did not meet anyone there, and had no intention of committing any act of violence or vandalism at the Capitol.

Defendant stated that he, his wife, and her friend went to the rally early in the morning, around 7:00 am, but by that time the crowd was so big, he was stuck far away from the stage and had a hard time seeing or hearing President Trump's speech. After the rally was over, Defendant stated that he saw people walking towards the Capitol, so he began to follow. He stated that neither his wife nor her friend went the Capitol with him.

Defendant stated that he climbed over some fences that had been previously knocked over and walked around some barricades. PSR ¶ 17. He stated he saw police officers but he did not engage with them. Defendant stated that he continued walking past a garden and a broken or

torn down fence, and he passed other barricades on his way to the Capitol. He said that some of the rioters were asking law enforcement officers for support since they had supported the police during Antifa and Black Lives Matter protests.  Defendant said he did not want to see that so he walked away from the police and the people trying to incite them.

Defendant admitted to entering the Capitol building.  PSR ¶ 17. He stated that once he was inside, he went into the Rotunda.  He said that he did not commit any crime while he was inside the Capitol; he just wanted to take pictures since he has an appreciation for art.  Defendant stated that he remained inside of the Rotunda for 10-15 minutes before he left, and that he did not return to the Capitol.

Defendant provided the agents with consent to digitally image or copy the contents of his phone, including his photos and videos. The agents did so and found numerous photos and videos of the Capitol grounds and inside the Capitol building, including Exhibits 2, 3, 5 and 7, above.

### *The Charges and Plea Agreement*

On January 19, 2021, Defendant was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2).  ECF 1.  On February 10, 2021, Defendant was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF 3.  On September 20, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in the Capitol Building. In his plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Defendant faces up to six months of imprisonment and a fine of up to $5,000. Defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a serious sentencing that includes incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. The attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each person who unlawfully entered the Capitol on January 6 did so under extreme circumstances. As

a person entered the Capitol, he or she would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also might have observed extensive fighting with law enforcement officials and likely would have smelled chemical irritants in the air. Given those circumstances, no rioter was a mere tourist that day.

Additionally, while looking at a defendant's individual conduct, the Court should assess that conduct on a spectrum. This Court, in fashioning a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; (9) whether the defendant otherwise exhibited evidence of remorse or contrition; and (10) whether the defendant held a position of trust or influence in the community. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to his or her fair and just punishment.

Defendant, an 18-year police officer, witnessed multiple warning signs for danger and violence as he made his way to the Capitol building. He saw downed barricades and members of the crowd inciting law enforcement officers. He heard chants of "Justice for Trump," and "fight for Trump" as he approached. He would have noticed chemical irritant in the air. Indeed, someone can be heard calling out, "tear gas" as Defendant stood with the crowd just feet away from barricades on the West Plaza of the Capitol grounds, lined with law enforcement officers.

In spite of all of these warning signs, Defendant decided to proceed forward into the U.S. Capitol building, entering through a doorway while an alarm blared. Although Defendant told FBI agents he entered the Capitol to view the artwork inside the building, as he penetrated the Capitol, he shouted, "We're taking the house back!"

Unlike some who turned back immediately, Defendant walked through multiple locations inside the Capitol for 20 minutes.  Notably, his pathway included walking through a marked fire door into the office suite of a United States Congressman.

While Defendant's statements after January 6 do show some remorse, they also show an attempt to shade the truth.  To begin, Defendant initially denied going to the Capitol building at all, and a review of his phone revealed that he had deleted the pictures and videos that he took that day.  Only after agents asked to view Defendant's "deleted" photo album and found pictures of him at the Capitol did he admit to going inside.  Yet even then, Defendant claimed that he did not commit any crimes, and just wanted to take pictures of the artwork in the building.  This is at odds with his cry of, "We're taking the house back!" upon entry, as well as his posed photo in the Rotunda in front of a statue of former President Gerald Ford defaced with a sign that read, "TRUMP 2020 – NO MORE BULLSHIT."  In the photo, Defendant smiles while pointing to the flag.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B.  Defendant's History and Characteristics

As an active police officer with 18 years of experience, Defendant was well aware of the great jeopardy posed by violent entry into the Capitol by the rioters.  Indeed, just six months earlier, Defendant had stood on the other side of a protest while on duty in Houston. Exhibit 11 is a video

(with screenshots pictured below) from Defendant's telephone dated June 2, 2020, capturing Defendant in uniform and riot gear helping to keep the peace in Houston.  According to news reports, a protest in honor of George Floyd with an estimated 60,000 people took place in Houston that day.[5]  Fortunately that protest remained peaceful.

**Exhibit 4[6]**
**(Screenshots at min 0:05 and 0:17)**



Based on his experience, Defendant knew better than many others present that day about the dangers presented by a large and aggressive crowd that vastly outnumbered law enforcement officers who were present and that pushed into a restricted building like the U.S. Capitol.

---

[5] *See* https://www.khou.com/article/news/local/george-floyd/george-floyd-updates-on-march-protest-on-june-2-houston-texas/285-55284292-3321-4bc0-b8b5-9bec89c426ed (last visited November 19, 2021).

[6] Exhibit 4 is a video being provided to the Court and Defendant in advance of the hearing.  The picture is a screen capture from that video.

17

Defendant has no known criminal history, and has been compliant with his conditions of pre-trial release.  While Defendant's service in law enforcement is laudable, it renders his conduct on January 6 all the more serious. While serving as a police officer, Defendant had to gird himself with riot gear to be prepared for potentially violent protestors.  He well knew about the potential for violence when an aggressive crowd pushes forward into a restricted government building. His decision to unlawfully enter a guarded government building is deeply troubling in light of his former service and training.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[7]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of Presidential power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see also United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be

19

deterred.") (statement of Judge Nichols at sentencing). .

The gravity of these offenses demands strong deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have severe adverse consequences.

*Specific Deterrence*

Members of law enforcement serve as role models to others, and civilians contemplating breaking the law are likely to be emboldened by the illegal conduct of a police office.  Defendant's unlawful conduct on January 6, while serving as an active-duty police officer, shows that restrictions on his behavior that did not apply to civilians were insufficient to deter him.  That, coupled with his initial attempts to minimize the gravity of his conduct, creates a real need for specific deterrence in the form of incarceration.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law-enforcement officers, to conspiracy to corruptly interfere with Congress.   Each offender must be sentenced based on his or his individual circumstances, but in light of the January 6 riot in which they joined with thousands of others. Moreover, each offender's case exists on a spectrum that ranges from conduct meriting a probationary sentence to crimes calling for years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.   A

probationary sentence should not necessarily become the default. [8]   Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants to date is low relative to the more than 650 cases currently pending, the government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Defendant has pleaded guilty to Count Four of the Superseding Information, charging him with Parading, Demonstrating or Picketing in the Capitol Building, in violation of  40 U.S.C.

---

[8]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases, but those agreements do not apply to this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

§ 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch

of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increases and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.  Here, to avoid unwarranted sentencing disparities, the Court should also consider the sentence imposed in the following cases:

In *United States v. Camper*, the defendant was a Marine veteran who spent approximately 10 to 15 minutes inside the Capitol.  Defendant Camper made some statements of intent including, "We're going to take this damned placed."  He likely destroyed a Go-Pro camera that he wore when he entered the Capitol.  Defendant Camper had a minor criminal history with one prior conviction, and he, like Defendant, turned himself in and agreed to be interviewed by the FBI.  The government requested a sentence of 60 days' incarceration and a payment of $500 in restitution. The court sentenced defendant Camper to the requested 60 days of incarceration and ordered $500 in restitution along with 60 hours of community service.  *See United States v. Boyd Camper*, 1:21-cr-00325 (CKK), Tr. 11/12/2021.

In *United States v. Gruppo*, the defendant was a 28-year military veteran with no criminal history who spent about 6 minutes in the Capitol building.  Defendant Gruppo voluntarily debriefed with law enforcement, and claimed that he entered the Capitol building to escape the surrounding chaos.  He self-surrendered, but only after the arrest of his travel companion that day.

23

The government requested a sentence of 30 days' incarceration and a payment of $500 in restitution. The court sentenced defendant Gruppo to two years of probation including 90 days of home detention, and ordered him to pay a $3,000 fine and $500 in restitution. *See United States v. Leonard Gruppo*, 1:21-cr-00391 (BAH), Doc. 32.

Facts that make the Defendant's conduct more serious than both Camper and Gruppo are that he was an active-duty police officer, carrying that imprimatur of authority at the time that he committed the offense, and that he penetrated the Capitol all the way into the office suite of a member of Congress.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[9]

---

[9] Attached to this sentencing memorandum is an Appendix providing additional information about the sentences imposed on other Capitol breach defendants.

**V.     Conclusion**

Sentencing requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As explained above, some of those factors set Defendant apart from the least serious actors on January 6.  Balancing all the § 3553(a) factors, the government recommends that this Court sentence Defendant to 60 days' incarceration and order him to pay $500 in restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     */s/ Alison B. Prout*
ALISON B. PROUT
Assistant United States Attorney
Georgia Bar No. 141666
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
(404) 581-6000
alison.prout@usdoj.gov

**APPENDIX**

Table 1: Cases in which the government recommended a probation sentence without home detention[10]

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
| Morgan-Lloyd, Anna | 1:21-CR-00164-RCL | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 40 hours community service, $500 restitution | 36 months' probation, 120 community service hours, $500 restitution |
| Ehrke, Valerie | 1:21-CR-00097-PLF | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 40 hours community service, $500 restitution | 36 months' probation, $500 restitution |
| Bissey, Donna | 1:21-CR-00165-TSC | 40 U.S.C. § 5104(e)(2)(G) | 36 months' probation, 40 hours community service, $500 restitution | 14 days incarceration, 60 hours community service, $500 restitution |

Table 2: Cases in which the government recommended a probation sentence with home detention

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
| Bustle, Jessica | 1:21-CR-00238-TFH | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 40 hours community service, $500 restitution | 60 days of home detention, 24 months' probation, 40 hours community service, $500 restitution |
| Bustle, Joshua | 1:21-CR-00238-TFH | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 40 hours community service, $500 restitution | 30 days home detention, 24 months' probation, 40 hours community service, $500 restitution |

---

[10] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

| Doyle, Danielle | 1:21-CR-00324-TNM | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 probation | 2 months' probation, $3,000 fine, $500 restitution |
|---|---|---|---|---|
| Bennett, Andrew | 1:21-CR-00227-JEB | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 3 months of home detention, 24 months' probation, 80 hours community service, $500 restitution |
| Mazzocco, Matthew | 1:21-CR-00054-TSC | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 45 days incarceration, 60 hours community service[11], $500 restitution |
| Rosa, Eliel | 1:21-CR-00068-TNM | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution | 12 months' probation, 100 hours community service, $500 restitution |
| Gallagher, Thomas | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 1 month home detention, 36 months' probation, 60 hours community service, a fine, and $500 restitution | 24 months' probation, 60 hours community service, $500 restitution |
| Vinson, Thomas | 1:21-CR-00355-RBW | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention,  3 years' probation, 60 hours community service, $500 restitution | 5 years' probation, $5,000 fine, $500 restitution, 120 hours community service |
| Dillon, Brittiany | 1:21-CR-00360-DLF | 40 U.S.C. § 5104(e)(2)(D) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 60 days home detention, 3 years' probation, $500 restitution |
| Sanders, Jonathan | 1:21-CR-00384-CJN | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 | 36 months' probation, 60 hours community |

---

[11] The government believes the Court's 10/4/2021 minute entry in this case is incorrect and the sentence requires 60 *hours* of community service, not 60 *months*.

| | | | months' probation, 60 hours community service, $500 restitution | service, $500 restitution |
|---|---|---|---|---|
| Fitchett, Cindy | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution |
| Sweet, Douglas | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 1 month home detention, 36 months' probation, 60 hours community service, $500 restitution |
| Cordon, Sean | 1:21-CR-00269-TNM | 40 U.S.C. § 5104(e)(2)(G) | 3 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 2 months' probation, $4000 fine |
| Wilkerson, John IV | 1:21-CR-00302-CRC | 40 U.S.C. § 5104(e)(2)(G) | 2 months home detention, 36 months' probation, 60 hours community service, $500 restitution | 36 months' probation, $2500 fine, 60 hours community service, $500 restitution |

Table 3: Cases in which the government recommended a sentence of incarceration

| Defendant Name | Case Number | Offense of Conviction | Government Recommendation | Sentence Imposed |
|---|---|---|---|---|
| Curzio, Michael | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | Not applicable | 6 months incarceration (time served), $500 restitution |
| Hodgkins, Paul | 1:21-CR-00188-RDM | 18 U.S.C. § 1512(c)(2) | 18 months incarceration | 8 months incarceration, 24 months' supervised release, $2000 restitution |
| Dresch, Karl | 1:21-CR-00071-ABJ | 40 U.S.C. § 5104(e)(2)(G) | 6 months incarceration (time served), $500 restitution | 6 months incarceration (time served), $500 restitution |

| | | | | |
|---|---|---|---|---|
| Jancart, Derek | 1:21-CR-00148-JEB | 40 U.S.C. § 5104(e)(2)(D) | 4 months incarceration, $500 restitution | 45 days incarceration, $500 restitution |
| Rau, Erik | 1:21-CR-00467-JEB | 40 U.S.C. § 5104(e)(2)(D) | 4 months incarceration, $500 restitution | 45 days incarceration, $500 restitution |
| Hemenway, Edward | 1:21-CR-00049-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 45 days incarceration, 60 hours community service, $500 restitution |
| Reeder, Robert | 1:21-CR-00166-TFH | 40 U.S.C. § 5104(e)(2)(G) | 6 months incarceration, $500 restitution | 3 months incarceration, $500 restitution |
| Bauer, Robert | 1:21-CR-00049-TSC | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 45 days incarceration, 60 hours community service, $500 restitution |
| Vinson, Lori | 1:21-CR-00355-RBW | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 5 years' probation, $5,000 fine, $500 restitution, 120 hours community service |
| Griffith, Jack | 1:21-CR-00204-BAH | 40 U.S.C. § 5104(e)(2)(G) | 3 months incarceration, $500 restitution | 90 days home detention, 36 months' probation, $500 restitution |
| Torrens, Eric | 1:21-CR-00204-BAH | 40 U.S.C. § 5104(e)(2)(G) | 2 weeks incarceration, $500 restitution | 90 days home detention, 36 months' probation, $500 restitution |
| Gruppo, Leonard | 1:21-CR-00391-BAH | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 90 days home detention, 24 months' probation, $3,000 fine, $500 restitution |
| Ryan, Jenna | 1:21-CR-00050-CRC | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 60 days incarceration, $1000 fine, $500 restitution |
| Croy, Glenn | 1:21-CR-00162-BAH | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 90 days home detention, 14 days community correctional facility, 36 months' probation, $500 restitution |
| Stotts, Jordan | 1:21-CR-00272-TJK | 40 U.S.C. § 5104(e)(2)(G) | 45 days incarceration, $500 restitution | 60 days home detention, 24 months' probation, $500 |

| | | | | |
|---|---|---|---|---|
| | | | | restitution, 60 hours community service |
| Fairlamb, Scott | 1:21-CR-00120-RCL | 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a)(1) | 44 months incarceration, 36 months' supervised release, $2000 fine | 41 months incarceration, 36 months supervised release, $2000 restitution |
| Camper, John | 1:21-CR-00325-CKK | 40 U.S.C. § 5104(e)(2)(G) | 60 days incarceration, $500 restitution | 60 days incarceration, $500 restitution, 60 hours community service |
| Rukstales, Bradley | 1:21-CR-00041-CJN | 40 U.S.C. § 5104(e)(2)(G) | 45 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Cordon, Kevin | 1:21-CR-00277-TNM | 18 U.S.C. § 1752(a)(1) | 30 days incarceration, 12 months supervised release, $500 restitution | 12 months' probation, 100 hours community service, $4000 fine, $500 restitution |
| Chansley, Jacob | 1:21-CR-00003-RCL | 18 U.S.C. § 1512(c)(2) | 51 months incarceration, 36 months supervised release, $2000 restitution | 41 months incarceration, 36 months supervised release, $2000 restitution |
| Mish, David | 1:21-CR-00112-CJN | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 30 days incarceration, $500 restitution |
| Lolos, John | 1:21-CR-00243-APM | 40 U.S.C. § 5104(e)(2)(G) | 30 days incarceration, $500 restitution | 14 days incarceration, $500 restitution |