## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR No. 1:21-cr-00109-TJK-1


                                  Washington, D.C.
v.                                Friday, December 10, 2021
                                  10:00 a.m.


TAM DINH PHAM,

                 Defendant.
- - - - - - - - - - - - - - - - x
_____

### TRANSCRIPT OF SENTENCING
#### HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
#### UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:   Alison Prout, Esq.
                         DOJ-USAO
                         Northern District of Georgia
                         Richard B. Russell Federal Building
                         75 Ted Turner Drive, SW
                         Atlanta, GA 30303
                         (404) 581-6105


For the Defendant:       Nicole D. Hochglaube, Esq.
                         David B. Adler, Esq.
                         Molly P. Bagshaw, Esq.
                         HOCHGLAUBE & DEBORDE, PC
                         3515 Fannin Street
                         Houston, TX 77004
                         (713) 526-6300


Court Reporter:          Timothy R. Miller, RPR, CRR, NJ-CCR
                         Official Court Reporter
                         U.S. Courthouse, Room 6722
                         333 Constitution Avenue, NW
                         Washington, DC 20001
                         (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                          **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  Your Honor, this is criminal

3      matter 21-109, United States of America v. Tam Dinh Pham.

4              Present for the Government is Alison Prout;

5      present for the defendant are Nicole Hochglaube and David

6      Adler; present from the United States Probation Office is

7      Aidee Gavito; also present is the defendant, Mr. Pham.

8              THE COURT:  All right.  Well, good morning -- wow.

9      Can we turn that volume down just a little bit.

10             THE DEPUTY CLERK:  (Indicating.)

11             THE COURT:  Okay.  Good morning, everyone.  We are

12     here for Mr. Pham's sentencing.

13             There is one thing, I think, we need to address

14     right out of the gate which is the defendant's request to

15     place his sentencing memorandum under seal.  I think we

16     should have this discussion under seal just to give the

17     defense the opportunity to say whatever they'd like to, to

18     make a record of it, but I can say, I don't see a reason why

19     that memorandum should be filed under seal, but I want to

20     hear from the defense about that.  So what I'd like to do is

21     move into an under-seal proceeding just briefly to give the

22     parties the opportunity to address that matter in part

23     because I suppose, in theory, if there is something in there

24     that should be under seal, it -- we would also not want to

25     reference that in open court during your allocution.

1          So if I can ask the courtroom deputy to seal

2     the -- well, let me just make sure.

3          Do both parties think that's an appropriate way to

4     proceed?  I'll just ask the Government first --

5          MS. PROUT:  Yes, Your Honor.  No objection --

6          THE COURT:  -- and then defense.

7          MS. PROUT:  -- to proceeding that way.

8          THE COURT:  All right.

9          MS. HOCHGLAUBE:  We do, Your Honor.  We would ask

10    that the courtroom be cleared for that purpose, as well.

11         THE COURT:  Yep.  Then it shall be so ordered.

12         If we can clear the courtroom for purposes of

13    placing it under seal.

14         (Following proceedings under seal:)

15    ████████████████████████████████████████████

16    ██████████████████████████████████████████████████

17    ██████████████

18    ███████████████████████████████████

19    █████████████

20    ███████████████████

21    ████████████████████████

22    ██████████████████████████████████████

23    ██████████████████████████████████████████████

24    ██████████

25    ████████████████████████████████████████



























1

2

3

4

5

6      (Following proceedings in open court:)

7          THE COURT:  All right.  We are here, as I

8  mentioned earlier, for the sentencing of Mr. Pham, who has

9  pled guilty to Count 4 of the information charging him with

10  parading, demonstrating, or picketing in a Capitol building,

11  in violation of Title 40 United States Code Section

12  5104(e)(2)(G).

13          I have received and reviewed the presentence

14  report and sentencing recommendation from the Probation

15  Office and the sentencing memoranda from both the Government

16  and the defendant, including the exhibits attached to those

17  memoranda by both parties, as well as the video exhibits

18  that were proffered by the defense -- by the Government.

19          Are there any other governments [sic] -- or

20  materials for me to review, Government counsel?

21          MS. PROUT:  No, not at this time, Your Honor.

22          THE COURT:  All right.  Defense?

23          MS. HOCHGLAUBE:  Nothing from the defense, Your

24  Honor.

25          THE COURT:  All right.

1          Mr. Pham, this sentencing hearing will proceed in

2     four steps.  And all the while, I want you to keep in mind

3     the seriousness of why we are here, if that even needs

4     reiterating.  You committed and pled guilty to a federal

5     crime and today's proceeding is about the consequences that

6     you will face as a result of your decision to commit that

7     crime.

8          The first step of today's hearing is for me to

9     determine whether you and your counsel have reviewed the

10    presentence report and whether there are any outstanding

11    objections to that report and, if so, to resolve those

12    objections.

13         The second step is usually for me to determine

14    what sentencing guidelines apply to your case and -- based

15    on your criminal history and any -- considering any

16    mitigating or aggravating factors that may warrant a

17    departure, but because the case -- the charge here is a

18    misdemeanor, the sentencing guidelines don't apply, but I'll

19    still take that opportunity to clarify, make sure there is

20    no confusion about the sentencing framework we are operating

21    under, under the applicable statute, the law.

22         The third step is for me to hear from the

23    Government, from your counsel, and from you if you wish to

24    be heard about sentencing in this case.

25         And the last step requires me to fashion a just

1    and fair sentence in light of the factors Congress set forth

2    in 18 United States Code 3553(a), and as part of this last

3    step, I will actually impose the sentence along with other

4    required consequences of the offense.

5            I don't think there are any objections here, but

6    let's first, then, turn to the presentence report.

7            That final presentence report and sentencing

8    recommendation were filed in this matter on November 19th,

9    2021.

10           So does the Government have any objection to any

11   of the factual determinations set forth in that report?  And

12   is the Government anticipating an evidentiary hearing here

13   today?

14           MS. PROUT:  No objections, and we do not

15   anticipate an evidentiary hearing, Your Honor.

16           THE COURT:  All right.  Very well.  You may,

17   again, remove your mask.  I know it's hard to remember, but

18   it will make it easier for me to hear.

19           All right.  And same question to defense counsel.

20   Have you and your client read and discussed the presentence

21   report?  Do you have any objection to the factual statements

22   in that report?  And are you anticipating any -- an

23   evidentiary hearing here today?

24           MS. HOCHGLAUBE:  We have read the report, we have

25   no objections to that report, and we do not anticipate an

1     evidentiary hearing, Your Honor.

2             THE COURT:  All right.  Mr. Pham, are you fully

3     satisfied with your attorney in this case, sir?

4             THE DEFENDANT:  Yes, Your Honor.

5             THE COURT:  All right.  Do you feel you've had

6     enough time to talk with her about the presentence report

7     and the papers the Government filed in connection with your

8     sentencing?

9             THE DEFENDANT:  Yes, Your Honor.

10            THE COURT:  All right.  You may be seated, sir.

11            THE DEFENDANT:  Thank you.

12            THE COURT:  I will, then, accept the facts as

13    stated in the presentence report and the presentence report

14    will be my findings of fact for purposes of this sentencing.

15            Now, the presentence report lays out the statutory

16    sentencing framework that applies in this case.  So I will

17    go ahead and summarize that.

18            Congress has imposed a maximum sentence for the

19    offense to which Mr. Pham has pled guilty.  The statutory

20    maximum sentence is six months of incarceration for this

21    Class B misdemeanor.

22            For supervised release, under United States Code

23    Section 19 and 3583(b)(3), supervised release is not

24    applicable.

25            Probation, on the other hand, is applicable.  And

1    under 18 United States Code 3561(c)(2), the defendant is

2    eligible for up to five years of probation because the

3    offense is a misdemeanor.

4         As far as fines go, there is a maximum fine for

5    the offense of $5,000.  There is also a mandatory special

6    assessment of $10 under 18 United States Code 3013(a).

7         So I will turn to counsel and ask them to confirm

8    that I have accurately stated the statutory framework under

9    which we're operating in regard to this case.

10        Government counsel?

11        MS. PROUT:  Your Honor, I believe that's all

12   correct.  I would add there is a potential for restitution

13   to be ordered, as well.

14        THE COURT:  There is a potential for restitution

15   and, in fact, as part of the plea agreement, the parties

16   have agreed on a restitution amount.

17        With that addition, same question to defense

18   counsel.

19        MS. HOCHGLAUBE:  That is correct, Your Honor.

20        THE COURT:  All right.  Any other -- have I

21   otherwise stated accurately the statutory framework here?

22        MS. HOCHGLAUBE:  You have, Your Honor.

23        THE COURT:  All right.  Very well.

24        All right.  Now, I must consider the relevant

25   factors that Congress has set out in 18 United States Code

1    3553(a) and ensure that I impose a sentence sufficient but

2    not greater than necessary to comply with the purposes of

3    sentencing.  Those purposes include the need for the

4    sentence imposed to reflect the seriousness of the offense,

5    to promote respect for the law, and to provide just

6    punishment for the offense.  The sentence should also afford

7    adequate deterrence to criminal conduct, protect the public

8    from future crimes of the defendant, and promote

9    rehabilitation.  In addition to the guidelines and policy

10   statements, I must consider -- well, in this case, I don't

11   consider the guidelines because the guidelines don't apply,

12   but in addition to those matters, I have to consider the

13   nature and circumstances of the offense; the history and

14   characteristics of Mr. Pham; the need for the sentence

15   imposed to comply with the purposes I just mentioned; I have

16   to consider the kinds of sentences available; I have to

17   consider the need to avoid unwanted sentence disparities

18   among defendants with similar records who have been found

19   guilty of similar conduct; and, as the Government points

20   out, I also need to consider the need to provide restitution

21   to victims of the offense.

22          So let me turn to Government counsel, invite you

23   to come all the way up to the podium here, and I will hear

24   you on application of the 3553(a) factors and the

25   Government's sentencing recommendation.

1              MS. PROUT:  Thank you, Your Honor.

2         Let me start by saying that -- and I think the

3    defense would agree with me here -- that this is a case of a

4    man who has lived a good life, but we are here because he

5    made a very bad decision, and sometimes those are the

6    hardest cases to come for sentencing.

7         When looking at the 3553(a) factors for the

8    defendant in this case, I think that the Court should first

9    look at what the defendant did in his individual capacity

10   and then place that in the context of the larger January 6th

11   riot.  And the Government's sentencing memorandum sets out

12   several factors for the Court to consider, but I'd like to

13   focus on three issues before the Court today.

14        The first is the defendant's participation in this

15   riot as an active police officer.  I focus on that because I

16   think it's one of the things that sets this defendant apart

17   from the many others who were present on January 6th.  This

18   is a man who was currently employed by the Houston Police

19   Department and, in fact, had 18 years of experience in that

20   position.  The defendant was not just an experienced police

21   officer, but as an officer for Houston, he, in fact, had

22   experience policing crowds and riots himself and only six

23   months earlier had participated in policing a protest in

24   Houston that reportedly had about 60,000 people present.

25   And I say that not because that was some foreshadowing or

1    because there was violence in that occasion but because

2    surely the police attending that event were trained in the

3    issues of crowd control, the eventualities that could

4    emerge, and understood the risks of a crowd that vastly

5    outnumbers a police force in a situation like that.

6         And so this is the backdrop with which the

7    defendant attended the U.S. Capitol on January 6th.  When he

8    told agents that he saw people trying to incite the police,

9    he must have understood the danger associated with that.

10   And when he crossed the downed fences and barriers, he would

11   have had to know that he didn't belong there.  And when he

12   saw a massive crowd moving toward the Capitol building in

13   the face of vastly outnumbered law enforcement officers, he

14   had to know the grave situation that those officers were in.

15   And finally, when he entered the Capitol building through a

16   door with an alarm blaring -- and on that note, I would add

17   that the Government submits that that alarm can be heard in

18   the video Exhibit-3.  It's a high-pitched sound that was

19   blaring.

20         THE COURT:  I heard it.

21         MS. PROUT:  And there were no metal detectors to

22   walk through; no security checkpoint; no other crowd

23   control.  We would submit that the Government [sic] had to

24   understand not only that he was breaking the law but that he

25   was truly contributing to the potential of violence simply

1    by being another body in the crowd moving forward into the

2    building that day.

3              The second factor the Government would ask the

4    Court to consider is that the defendant downplayed the

5    seriousness of his conduct and the reason that he was there.

6    After the events of January 6th, the defendant was

7    approached by the FBI on January 12th.  And to his credit,

8    he did voluntarily agree to give an interview with the FBI.

9    There are two concerning facts that arose from that

10   interview.  The first is that when he initially described

11   his whereabouts that day, he denied going into the Capitol

12   building.  Agents then asked to see his phone and he showed

13   pictures on his phone, but the agents noticed that there

14   were no pictures from January 6th.  And so they asked if

15   they could look at his deleted photos and he agreed.  And in

16   those deleted photos, they saw photos and videos that were

17   clearly taken of the Capitol and the Capitol grounds and, at

18   that point, the agents paused and gave the defendant 1,001

19   warnings about being honest with law enforcement and only

20   then did the defendant say that he would tell the truth and,

21   at that point, he did admit to entering the building and

22   walking around the rotunda, but -- and this is the second

23   concerning part of this interview -- he told the agents that

24   he only wanted to take pictures because he had an

25   appreciation for the art.  And it's hard to be in the

1    Capitol building and not appreciate the majesty and the art

2    of that building and, in fact, the defendant did take

3    pictures of the ceiling of the building while he was there,

4    but after the agents had time to look at those photos and

5    videos on his phone, what they found is something more than

6    just an appreciation for art.  They found a video of the

7    defendant walking into the building shouting, We're taking

8    the house back.  They also found a video of the defendant on

9    the west plaza where he joined in chants of stop the steal.

10   He now claims that those statements didn't mean things the

11   way they sound, but as a police officer, the defendant must

12   understand that actions have consequences.  And I would add

13   that for sense of timing here, we understand that the

14   defendant resigned from the Houston Police Department.  That

15   took place only after the FBI had conducted the interview

16   with him.

17             The third factor I would ask the Court to consider

18   is the defendant's --

19             THE COURT:  Ms. Prout, can I just --

20             MS. PROUT:  Yes?

21             THE COURT:  -- ask you one thing before you move

22   on to the --

23             MS. PROUT:  Certainly.

24             THE COURT:  -- third factor.  So I'm assuming you

25   -- I'm going to ask the defense this, but, obviously, I

1    don't have -- I mean, he agreed to certain facts as part of

2    his proffer here.  I'm assuming -- and, certainly, from

3    reading the memoranda, he -- the defense puts a different

4    spin on some of these facts that you are raising in terms

5    of -- well, I've seen the video exhibit.  The exhibit is

6    what it is.  I'm assuming -- the -- just on this issue of

7    what he told the police, do you know whether there's any --

8    I mean, I guess this is really something I'll ask

9    Ms. Hochglaube at the appropriate time, but I don't -- do

10   you know whether the defendant disputes those statements

11   that he made to -- that you're saying he made to the FBI?  I

12   mean, obviously, again, I don't think there is any dispute

13   from my reading of the sentencing memoranda that he -- that

14   the FBI eventually found the photos in his deleted, you know

15   -- in the portion of the phone that holds files that have

16   been deleted or photos that have been deleted.  They make an

17   argument about, sort of, what his intent was and why he did

18   that and you all argue something slightly different.  But as

19   far as the statements go, do you know whether there's a --

20   do I have an issue here in terms of whether there's

21   agreement on whatever he might have said at a given time?

22            MS. PROUT:  Your Honor, the Government's

23   statements in its sentencing memorandum and today come

24   directly from the report that was drafted after that

25   interview.  In reading the defense sentencing memorandum, I

1     -- my reading is the same as the Court's which is they may

2     put a slightly different spin or weighting on some of those

3     facts.  I don't believe they dispute them.  To the extent

4     that we do have a serious factual dispute here, we do have

5     Special Agent Stayman [ph] who we could call.  She was not

6     present at the interview; however, she has spoken to the

7     agent who was and has also reviewed that report.  I don't

8     think that will be necessary, because I think we're talking

9     about shades of difference.

10          THE COURT:  Sure.  Okay.  I just want to make

11    sure, you know -- like you said, to the extent there is a

12    factual -- there develops a factual dispute here -- well, it

13    sounds like you have the ability to put something on for me

14    to resolve it if we find that necessary --

15          MS. PROUT:  Yes, Your Honor.

16          THE COURT:  -- but -- okay.  Fair enough.  Anyway,

17    third -- your third point?

18          MS. PROUT:  Thank you.

19          The third point the Government would suggest to

20    the Court to focus on is the defendant's time and route in

21    the building.  And it was certainly not the longest or the

22    most egregious, but it was also not the shortest.  We've

23    seen defendants in this case who took three steps in, peered

24    around, realized they weren't where they should be, and

25    backed out.  In this case, the defendant spent 20 minutes

inside the building and traveled across multiple locations
within that building, and particularly of note is that the
defendant entered a door that was marked a fire door and
walked through what he may not have realized at the time but
were the office suites of House Leader Kevin McCarthy.  And,
as the Court can see from the photos submitted in the
sentencing memorandum, there were computers and files right
out for all to see.  The defendant didn't touch any of that.
He didn't seem to be interested in invading any of that
confidential information, if it was confidential, but he
also didn't poke his head in and say, Whoa, I shouldn't be
here, and back out; he walked through that office and then
he turned around and backed out.  And so I don't want to
make more of it than it was, but it does set him apart from
somebody who entered the lobby and then turned around.  And
really, I think what the significance of his time and route
in the building is, is that this is someone who should have
known better, and if he had gotten caught up in the moment,
there were plenty of opportunities for him to realize it and
turn back before he did.

And so those are the individual acts of this
defendant.  And, of course, all of that has to be looked at
in the context of what happened on January 6th which was a
grievous attack on the Capitol that actually achieved the
objective of disrupting the congressional certification of

1    the Electoral College vote.  It threatened the peaceful

2    transfer of power following the election, and I would submit

3    that looking at the videos that the Government has located

4    of the defendant, that he seemed to be happy and excited to

5    be a part of it that day.

6            To touch briefly on the other 3553(a) factors, the

7    defendant's history and characteristics, of course, are

8    important here.  And we absolutely acknowledge the

9    defendant's lack of criminal history and that this event

10   appears to be an isolated lapse in judgment, and that is

11   reflected in the Government's sentencing recommendation

12   today.  We also acknowledge the defendant's laudable history

13   of public service as a police officer and, as I've discussed

14   in this case, I think that cuts in both directions for him.

15   In addition to the fact that he should have known better by

16   virtue of that position, there is another problem with

17   someone in that position participating in the January 6th

18   riot, and that is that it gives an air of legitimacy to

19   being there.  And even if he wasn't in his uniform, we don't

20   know if anyone from Houston saw the photos or the videos, of

21   which there are innumerable, who could have seen him there.

22   Did anybody from his family who knows his job know that he

23   went there that day?  And what is the significance to the

24   narrative of January 6th in having active duty police

25   officers -- and, in some cases, we've seen military members

1    or veterans -- present that day?  It's concerning because

2    part of the narrative that we hear after the fact is that,

3    maybe, there was some legitimacy to the riot.

4            In addition to the defendant's history and

5    characteristics, the Court, of course, needs to consider the

6    concerns of general and specific deterrence, and I do

7    believe that in this case, it's truly general deterrence

8    that is the bigger concern.  I don't believe that we will

9    see the defendant put himself in a position like this again.

10   But something in the defendant's sentencing memorandum

11   captured for me the need for general deterrence here.  It

12   said that the defendant got caught up in the moment.  And

13   this is a quote:  It is the type of decision that is so

14   critically important in hindsight but in the moment seems so

15   meaningless.  And I think, for me, that really encapsulates

16   the need for general deterrence, because we've heard many

17   comments like this from defendants after the fact; after

18   they're caught by the police; after they're facing

19   consequences from the court.  And a sentiment like that

20   almost seeks to excuse the mob mentality.  The idea of being

21   caught up in the moment somehow makes it better.  But I

22   believe that general deterrence is so important here

23   precisely because we want people to understand and think

24   about those consequences before they act, not in hindsight.

25   And for that reason, even though, in the scheme of things,

1     Mr. Pham's conduct was certainly less serious than many

2     other people who were present that day, general deterrence

3     should be a consideration, I believe, in this and in all of

4     these cases.

5             And so for those reasons, Your Honor, the

6     Government is seeking 60 days of incarceration in addition

7     to $500 of restitution that has been agreed as part of the

8     plea agreement.

9             THE COURT:  Ms. Prout, before I turn to the

10    defense, I think I have two follow-ups.

11            As you mentioned, the fact that Mr. Pham is a

12    police officer, kind of, has -- cuts a -- cuts different

13    ways here -- or was at the time.  One way you didn't mention

14    but I just want to know if you think it's fair for me to

15    weigh is that, in a way, the penalty he paid here was

16    harsher already than what some other people may have -- the

17    penalty they may have paid.  If someone lost their job --

18    maybe, some folks haven't lost their jobs at all as a result

19    of this, and then as for other people who lost their job,

20    maybe, they can pick up a similar, you know -- a similar

21    job -- they could turn to another employer relatively

22    easily, but Mr. Pham has lost presumably his opportunity to

23    be a police -- certainly, to be a police officer in Houston,

24    but -- and probably to be a police officer anywhere else,

25    and that comes with a loss -- a financial loss as well and

1    all the rest.  So I think it's fair for me to weigh that,

2    don't you?

3            MS. PROUT:  I do, Your Honor.  And I would submit

4    that that also cuts both ways, because in the course of

5    sentencing defendants in a number of cases, including white

6    collar cases, we often see that defendants who have the most

7    lose the most as a consequence of their conduct.  And so it

8    is at the same time that we think the defendants who have

9    the most may be in the best position to avoid making those

10   decisions.  But I do agree that that is a consequence that

11   affects this defendant more so than others.

12           THE COURT:  The other thing I wanted to raise with

13   you and I'm going to certainly raise -- you touched on a

14   number of things that I want to raise with defense counsel

15   when she has the opportunity to address me, but one thing in

16   particular caught my eye that I wondered if you wanted to

17   comment on one way or the other.  At various points in the

18   sentencing memoranda -- memorandum, the defense claims that

19   the defendant was -- It is under -- this is Page 9:  It is

20   under these circumstances that Mr. Pham walked into the

21   Capitol building unaware initially that he was not welcome

22   inside.  Page 11:  He saw that officers were gone and

23   genuinely believed it was all right to go in.  The statement

24   of offense that he has agreed to in this case, Paragraph 12:

25   The defendant knew at the time he entered the U.S. Capitol

 1   building that he did not have permission to enter the

 2   building.  So is the Government concerned that there appear

 3   to be representations in the sentencing memorandum that

 4   contradict what Mr. Pham already swore to as true?

 5            MS. PROUT:  I do think that's one possible reading

 6   of the defendant's memorandum.  I think it's a valid

 7   question to ask.  I don't know that it's clear-cut enough

 8   from those statements that there's no way to reconcile those

 9   statements, but I think it's a valid question, Your Honor.

10            THE COURT:  All right.  Very well.  Thank you.

11            MS. PROUT:  Thank you.

12            THE COURT:  I will turn now to Ms. Hochglaube for

13   -- to hear from the defense counsel -- the -- from the

14   defense.  And while you make your way up to the podium, I

15   want to lay out some concerns I have --

16            MS. HOCHGLAUBE:  Sure.  Should I bring Mr. Pham

17   with me or should I have him wait at the table?

18            THE COURT:  He can wait there.  I mean, I -- it --

19   there will be an opportunity, of course, for him to address

20   me after you have allocuted however you would like.

21            MS. HOCHGLAUBE:  Thank you.

22            THE COURT:  I do think that, you know -- the

23   Government touched on a few of these things, but I'd like to

24   lay out a few things a little more comprehensively, some

25   concerns I had with regard to the arguments that are laid

1    out in that memorandum.

2          I guess, first, there are -- at various points in

3    it, I think it's fair to say that I'm skeptical of how you

4    all have portrayed Mr. Pham's conduct and intentions.  So

5    I'm just going to lay them out so that you can address them.

6          But the first thing is his decision to come to

7    D.C., you know?  Right on Page 4 of the memorandum, I think

8    it's fair to say this, sort of, sums up -- and if it

9    doesn't, you'll correct me -- but it -- I think it's, sort

10   of, fair to say this sentence sums up how you would describe

11   his various motivations for coming:  This trip would be the

12   perfect opportunity to work on his family's food business,

13   see the capital of the country he loves, and hear what he

14   predicted would be a historically entertaining speech.  That

15   sounds like his main motivation to come was in that order;

16   that it was really this issue of the family food business

17   and then tourism and then only third was, sort of, the

18   speeches and other events of the day.  And for reasons I

19   think, maybe, I'll get into in a moment, that strikes -- I'm

20   skeptical that there weren't places closer to where he lives

21   in Texas to do research for his -- the nascent food business

22   or restaurant he wanted to start.

23         The second thing is how he characterize -- how you

24   characterize what he saw and, I think, regarding police

25   officers that day and what I perceive as the delta between

1    what is represented and what I saw in the exhibits offered

2    by the Government -- the video exhibits.  I think you say

3    that he never saw officers acting in a way that indicated

4    stress.  And I -- one of those exhibits is -- contains

5    someone screaming at a police officer and, sort of, daring

6    the police officer to engage in violence with the

7    individual.  So I guess I'm really having a hard time seeing

8    how that wouldn't have indicated stress.  That's on Page 5.

9    On Page 14, you say he never saw an officer assaulted or

10   threatened.  Again, I'm skeptical of those things, given

11   what I've seen on -- in those exhibits.  That's the second

12   point.

13            The third point is the point I already brought up

14   with the Government.  I, you know -- he swore under oath

15   that he was -- again, I don't want to misquote -- he swore

16   under oath that he knew at the time he entered the U.S.

17   Capitol building that he did not have permission to enter

18   the building, and that is not surprising given the

19   circumstances, but now, you know, at various times in the

20   memo, you mentioned that he was -- again, I don't want to

21   misquote things, but, you know, it is represented that, for

22   example -- let's see -- here it is -- that he was unaware

23   and, you know -- It is under these circumstances that

24   Mr. Pham walked into the Capitol building unaware initially

25   that he was not welcome inside.  That's Page 9.  And then on

1    Page 11:  He saw that the officers were gone and genuinely

2    believed it was all right to go in.  I welcome your

3    explanation as to how those two statements are consistent

4    with what he has already sworn was true and, frankly, what

5    is much more credible.

6              Fourth, there's all the issues surrounding this

7    interview with the FBI and whatnot, and I think it would be

8    helpful for you to clarify whatever argument you're going to

9    make about whether we don't have a factual dispute about

10   what he said one way or the other to the officers, but

11   either way, I think, even if we don't have a factual, you

12   know -- said -- put about what was said aside.  Again, I

13   think you argue in the memo that, Well, he -- by placing

14   those photos in the delete box, he wasn't trying to destroy

15   evidence.  And I guess, you know, he's not charged with that

16   here, clearly.  And so this is really about, sort of --

17   really about whether he's -- in my mind, all these things

18   are really about whether he's fully taking responsibility

19   for what happened that day.  It just seems to me quite

20   obvious.  I think you say he saw the news coverage, saw what

21   had happened.  Yes, I'm sure it was about the fact that he

22   didn't want to embarrass the Houston Police Department which

23   I think is what you argued his motivation was, but I also

24   think it's -- given -- especially given his training as a

25   police officer, it's very difficult for me to believe that

 1    it wasn't in part due to the fact that he knew he might be

 2    in trouble and he might have his own criminal exposure as,

 3    in fact, he obviously had, given that we're here.  And so

 4    it's hard for me to really believe that that wasn't a

 5    motivation -- an understandable motivation perhaps -- to

 6    want to delete those photos.

 7            And last -- this is, I think, number five, and I'm

 8    sorry to do this, but these were things that really struck

 9    me -- I think it's fair to say that throughout the memo, you

10    have portrayed Mr. Pham as someone who was a, sort of,

11    disinterested observer in what was happening; that he wasn't

12    a true participant in the way that other people there were.

13    And, you know, I have -- in terms of what the Government has

14    provided in terms of exhibits, I have a photo of him wrapped

15    in a flag with the former president's name outside the

16    Capitol; I have a photo of him in the rotunda next to a flag

17    with the former president's name; I have him on video or,

18    you know -- video and audio chanting stop the steal; I have

19    him on audio and video saying, We're taking the house back.

20    And so when I -- and you've offered explanations for all

21    those things in the memo, and I get that.  But looking at

22    all those things together, you know, it's not -- I'm

23    skeptical about whether he truly was disinterested.  And,

24    again, that doesn't mean -- the reason I'm drilling into

25    this is because it affects whether he is really accepting

1    responsibility for what he did that day or whether he's --

2    full responsibility or whether he's only accepting

3    responsibility to the point where -- that he really needs to

4    for this plea and to be able to plead to this offense and

5    nothing more.

6          So with that, I'll stop talking, but I wanted to

7    lay out some of those concerns ahead of time so you would be

8    able to address them.

9          MS. HOCHGLAUBE:  And for that, I'm very grateful,

10   and please don't be sorry.  I -- very much appreciating

11   [sic] recognizing particular areas with which the Court has

12   legitimate concern.  I appreciate that chance.

13         I want to go a little bit backwards down the list

14   from what the Court has mentioned.

15         You mentioned your fifth point, sort of, as to the

16   minimal participant, and there's definitely -- that's a

17   concern that's certainly not lost on this team.  We are

18   oftentimes in court with facts that are just what they are.

19   I would love to one day be able to file that mysterious "can

20   I get new facts" motion, but that's obviously not one yet

21   that's on the books and is --

22         THE COURT:  Look, the facts are what they are.

23         MS. HOCHGLAUBE:  Right.

24         THE COURT:  I'm not criticizing -- I'm not even

25   really reacting to the facts so much as I'm reacting to the

1    fact that I'm not sure that I find the explanation,

2    stitching all those facts together, to be 100 percent

3    credible in terms of what he was really doing there.

4              MS. HOCHGLAUBE:   Sure.  And I oftentimes, too,

5    think in this world of what we do that truth can be indeed

6    stranger than fiction sometimes, and this is one of those

7    junctures in my opinion.  If -- one way, I think, to

8    reconcile this in terms -- and for me, in my mind, it has

9    been a way to reconcile this -- is to consider, you know,

10   this is clearly an outstanding job by the Government and the

11   prosecution putting together the relevant materials and

12   relevant facts in their memo; in their presentation to the

13   Court; and, you know, it is to be expected that they would

14   come to this defendant with everything they have, and

15   they've done so.  And it's the absence of certain things, I

16   think, that also speaks very loudly here.  And in ultimately

17   recovering Mr. Tam's phone and access to all of his

18   materials, what they don't have, because it does not exist,

19   is any kind of dialog connecting with any person or any

20   group about coming to D.C. for purposes of this rally.

21             What I appear to have done a rather inarticulate

22   job of describing in the memorandum is that, you know, he

23   comes from a very conservative Vietnamese community in

24   Houston and those are the people with whom he regularly

25   interacts, and there are, indeed, people who very likely

1   were interested in having dialog about what was going to be

2   specifically happening here in D.C., but he was not one of

3   those people.  And, in fact, you know, the -- he came with

4   his wife and a friend, and they were both more interested in

5   actually seeing the speech.  For budgetary reasons and very

6   conservative, sort of, spending habits, the Phams don't

7   travel.  And this indeed -- and as very corny as I recognize

8   it sounds -- he loves this country and was really excited

9   about the opportunity to come here because of a, you know --

10   a deep love.  When he -- and I'm going to go, again, off

11   trail here a little bit, but I promise to come back to your

12   questions.

13          He came here when he was a 17-year-old boy with no

14   food in his stomach, the clothes on his back, and no promise

15   of any job, a home, and nevertheless was gleeful like it was

16   Christmas morning, you know?  He'd been given the

17   opportunity to be here, whether -- and he did, in fact --

18   he -- exist in a -- he was homeless when he first arrived

19   here, and every morning since he arrived here in 1991 --

20   he's a man of strong faith -- he wakes up and it -- believes

21   it's his responsibility to give gratitude for the blessings

22   that he's received, and he's received many.

23          And so, you know, going back to the question which

24   is No. 5 on the list of concerns, it seems incredible, but

25   this, again, is one of those truth is stranger than

1    fictions.  Two people he cared about a great deal who were

2    more active in the community -- there were a lot of

3    community meetings that were really, kind of, focused on

4    politics which he worked long hours and did not attend.  He

5    had, kind of, almost three jobs that I would describe, you

6    know?  One is, of course, the patrolman which is also

7    noteworthy because, you know, there's been, sort of, this

8    image -- and I don't want to belittle the work of our street

9    patrolmen.  These are extremely important, you know, members

10   of our community who serve us in the hardest capacity every

11   day, but oftentimes you see, with any period of time, a

12   police officer takes exams and they seek promotion; they

13   seek leadership; they do things to try to, sort of, take

14   charge, if you will.  Mr. Pham was just happy working the

15   beat, if you will.  He was a patrolman.  He loved being in

16   the community and was such an asset to his community because

17   he spoke Vietnamese.  And the community, as you can see from

18   the commendation letters and his own department and how he

19   did, loved him back.  So this is not a person who was trying

20   to get promotions or had a lot of leadership skills and

21   didn't want them.

22           And so when he had two people he cared about

23   deeply who were more interested in this, you know -- he --

24   that's his, you know -- he, kind of, put the first job aside

25   which is, I'll take time off from work to go do this.  They

1    had literally converted their garage.  They live out in the

2    suburbs of Houston.  They -- in an area that is -- suburban

3    area which is -- their garage is no longer a garage.  It is

4    a test kitchen.  And they have had some false starts in

5    opening -- so this is not a business which is, sort of, an

6    afterthought, right, which I think also could potentially --

7    if it was like, Oh, I think I'm going to have another

8    business or I'm going to do this other thing, you know, it

9    sounds to me more incredible, but the reality is that these

10   are people for years who have been working to try to have

11   their restaurant business or actually more of a large-scale

12   catering business.  Convert the garage.  They do all their

13   testing particularly focused on making sausage which

14   actually has some international support, the sausage that

15   they've been, sort of, refining.  They bought space or

16   leased space back right around the time that Hurricane

17   Harvey hit the Houston area which very much just torpedoed

18   that endeavor, but then they started trying to rebuild.

19          And so when I say the business idea in his mind,

20   it's something he came home to after a long day every day

21   for many, many years, and they had been reaching out -- what

22   the Government would find on social media is the complete

23   absence of any political dialog whatsoever which, of course,

24   if it had existed, would absolutely be in the Government's

25   memo.

1          THE COURT:  I believe you.

2          MS. HOCHGLAUBE:  Yeah.  I mean -- and there's no

3    texts; there's no dialog; there's no, Hey, Mr. Smith, I'd

4    like to meet you here to talk more about some political --

5    there's nothing.  Nothing like that.  What there is, is

6    dialog on social media about food.  And so on their list --

7    which they just had not budgeted to make the trip -- was to

8    go to Arlington because there is apparently a strong

9    Vietnamese community there and he was interested in that

10   opportunity to make his wife happy, go with a friend, have

11   an excuse to come to the capital of the country he is --

12   that literally saved his life in terms of, you know,

13   providing opportunities for him and to go to the Vietnamese

14   community.  So the tragedy of this was -- is that -- so

15   after seeing this speech -- which indeed he was interested

16   in seeing, no doubt, and it's referenced in our memo.  He

17   thought that President Trump was very entertaining; that it

18   could be, you know, guaranteed that there would be something

19   unexpected to hear.  And so he was indeed very much looking

20   forward to this speech and to going to the rally but didn't

21   have enough of a personal feeling about who was going to be

22   president -- and I will add even more personal information

23   than the Court may want on this score, but he has saved and

24   scrimped and saved, which is part of the budgeting that goes

25   on in their household, and he has invested in some green

1   energy stocks over the years and, you know -- like Tesla and

2   things of this nature.  And so there is a reference to him,

3   like, constantly checking his phone, which is something he

4   does pretty obsessantly [sic] -- obsessively.  And so from a

5   political standpoint, the reality is that, to him, green

6   energy with a different administration boosts his checkbook

7   inevitably.

8           So there's no -- what is so different in this case

9   -- and I really say this with the understanding that I do

10  not want to provide some idea that there is a diminishment

11  of his devastating shame over this and accepting

12  responsibility, because he had responsibility which is why

13  he pled.  But what was going on in Mr. Pham's head is

14  unusual and it is indeed as described.  He was indeed

15  excited to see the president speak, but he was even more

16  excited to see the capital of the country he loved that he'd

17  never, ever budgeted to come and see.  He wanted to go and

18  take this recipe to Arlington and to talk to other people in

19  the Vietnamese community about starting this because, again,

20  it's not like a restaurant.  You're not going to come to

21  Houston and then come sit down at a booth and -- maybe, in

22  the future -- but have dinner at Mr. Pham's restaurant.  He

23  does large-scale catering.  So you would order 1,000 pieces,

24  for example, of the sausage that he and his wife make.

25  They've bought a special machine that they're trying to

1    retool for the right sized gears and things for non-metrics

2    and so forth.  I mean, it's -- that's the type of food

3    business that we're talking about.

4              They are also planning to go, and had prior to

5    this event -- which, of course, this changed everything --

6    to the West Coast, and they had identified communities

7    there.  So east and west, they wanted to go and let people

8    try their food for these large events that people would put

9    on and expand across the United States.  That was the plan

10   even before this happened, and it so happened that he was

11   making these plans with the idea that he was going to be

12   retiring in two years.  And his retirement, had it

13   materialized, would have provided the safety net to allow

14   for that travel to go out and meet the people that he needed

15   to meet to grow that business and still have his children

16   going to school.  He has -- his oldest daughter -- the

17   farthest they've gone for personal travel was Austin, Texas,

18   which is where UT is so she could see the campus, but all of

19   this retirement, which was going to be and will now -- never

20   come now -- $4,000 a month would have allowed for him to do

21   these things without so much worry about his budget.  And so

22   as, no doubt, how unbelievably it must land on the Court's

23   ears, I can tell you this is the strange world of Mr. Pham's

24   existence at that time.

25             So the -- going backwards, I am very concerned

1  that something that I have said has relayed in the memo some

2  desire that he not accept responsibility, which he would be

3  -- and I'm very happy that you're going to be able to hear

4  from him directly and I invite the Court to ask him any

5  question the Court should have, but I can tell you he will

6  be sad with me if I have conveyed something in our lengthy

7  dialogs that we together used to put together this

8  memorandum for the Court that conveys some minimization

9  whatsoever of his role in this thing.

10         THE COURT:  Well, just start with the very basic

11  -- I don't know what number it was on my list, but it was

12  the only thing I, kind of, went back and forth with the

13  Government about --

14         MS. HOCHGLAUBE:  Right.

15         THE COURT:  -- a little bit.  How is it that he --

16  can you reconcile what he swore was true when he pled guilty

17  and what has been represented in the memo that -- again, I

18  don't -- but words to the effect that he really thought it

19  was okay to come in and he didn't, you know -- that -- he

20  didn't know that he wasn't allowed to be in the Capitol with

21  the fact that he swore that he knew that he didn't have

22  permission or -- again, I'm, sort of -- I'm not -- I don't

23  have that all in -- right in front of me, but --

24         MS. HOCHGLAUBE:  And I've --

25         THE COURT:  Okay.

1           MS. HOCHGLAUBE:  I've got it numbered.

2           THE COURT:  All right.

3           MS. HOCHGLAUBE:  It's No. 3.  And I want to

4    connect that also -- there's -- this actually, in my mind,

5    connects with your Concern No. 2 which was the officers and

6    the distress or lack of distress that he witnessed and then

7    ultimately No. 4, the interview with the FBI.

8           So I'll start with No. 3 which was, you know, how

9    can you say, "I'm pleading guilty," and swearing to the

10   Court that, "I knew that I was not to be in the Capitol"?

11   And I will tell you -- and I think it was at the time he

12   entered, and I'm hearing that now read aloud multiple times,

13   and I can understand that at the time you first set foot in

14   the Capitol is the way that that is being read, but when we

15   read it and when we had dialog about it, it -- there was

16   indeed a time when Mr. Pham knew he was not to be in the

17   Capitol.  And I can break down -- in fact, Government

18   Exhibit No. 1 is pretty helpful to paint a timeline of what

19   was happening.

20          So they couldn't, it turns out, really hear the

21   president's speech after all.  There was a lot of just, sort

22   of, general noise.  There's been, no doubt -- and I think it

23   would depend on where you were in the crowd.  Where they

24   were in the crowd, they couldn't particularly hear exactly

25   what had been said.  They could hear little pieces of it and

1    they could hear just general noise, crowd noise.  And the

2    wife and the girlfriend of the wife had to, at some point --

3    this was a long, long morning or day -- use a restroom

4    which, the Court might imagine, was somewhat difficult to

5    find.  So they set off to find a restroom in the course of

6    people, for reasons unclear to the Phams at that time,

7    moving down the Mall away from where the speech was

8    happening toward the Capitol, but they were happy to be

9    going.  I mean, there's no pushback, Oh, we shouldn't go

10   here.  Find a restroom.  It took some time, you know, to get

11   in a line and to go and then come back.  And there's, I

12   think, mention in the Government's memo about, you know, why

13   didn't the wife and the girlfriend of the wife go, then,

14   further?  There had just been a lot of standing and waiting

15   and walking.  And so they sat ultimately at a location just

16   to rest, and Mr. Pham -- and this is where the story very

17   much should have ended, unfortunately -- continued to walk

18   but left them sitting to rest and continued to walk.

19        He walked where you see ultimately Government

20   Exhibit No. 1.  And you do see, if you watch the video -- I,

21   you know -- hearing your concerns about what you're hearing

22   and seeing there, he did see that, too.  And the bicycle

23   racks were -- the -- sorry, the metal bicycle-rack-looking

24   dividers were there.  There were people who had on the

25   standard-issue uniforms of -- at that time, but they were

1   not -- they were acting much the same way that Mr. Pham was

2   acting in the pictures you've received from the very

3   peaceful march in Houston.  And so he sees them; it appears

4   that they have it under control, but he also sees that there

5   are bicycle racks up stopping people from going further.

6   People were being rude, he thought, and so he perceived that

7   at the time as they don't like that they're not being let to

8   go further.  He walked back down the hill where -- to where

9   his wife and the friend were waiting, and that's when the

10  picture of the flag was taken that somebody standing nearby

11  had.  They sat for a little -- not much time, quite frankly,

12  and then were hearing people who were proceeding up the hill

13  say, They're letting us in.  They're leaving.  They're

14  letting us in.  So he walked back up the hill and indeed the

15  bicycle racks which had been used to separate the crowd from

16  that area were set aside.

17          And the dialog actually before the plea was more

18  about -- like, there was no climbing over anything which,

19  you know, there had been iterations, I think, of that in

20  various things.  You climb over something which, sort of,

21  implies this, sort of, in my mind, extra aggressive and

22  sneaky way of getting into somewhere.  If you have to climb

23  into it, it's not a normal way that a person gets there.

24  But that didn't occur.  These things were set aside.  In --

25  now, in hindsight, set aside may not be indeed what had

1   happened.  They may have been knocked down or pushed aside,

2   but Mr. Pham was not there when that occurred.  He was down

3   with his wife and the friend.  Proceeds up there.  Indeed,

4   it appears that the police officers have gone away.  He sees

5   that the barricades have been moved aside and he does

6   proceed into the building.  It's also noteworthy -- I see --

7   so -- and I think the area that I'm referring to is the

8   reflecting pool -- and I hope I have that geographically

9   correct -- where he had gone.  So if that gives the Court an

10  idea of what he could see and what he could not see, that's

11  what he was -- that's his position at this juncture.

12          So he thought when he, at that stage, was walking

13  past that the people were relaying what they were seeing

14  which is, They're letting us in.  He proceeds in.  You can

15  see some, in hindsight -- I'm hesitant to use this word in

16  court -- stupid pictures from inside the building.  I mean,

17  he's pointing at a Trump flag.  He is, you know, not

18  touching anything, but it, you know -- I say stupid because

19  in another context, maybe, that would be silly behavior,

20  but, certainly, there's nothing silly about this.  And he --

21  you'll also see -- again, the Government scours every bit of

22  information he has.  That's it.  That's the worst of it.

23  And he also takes a picture with a mask on.  He's at a --

24  he's at this event with a mask on at this time which you'll

25  notice in one of the pictures where he takes -- there's no

1      political implication in the photo that he takes with a

2      statue or has someone take, with a statue, of him.  He takes

3      a picture of the beautiful dome in the building and he is

4      milling around for, say, 15 minutes, as best we can

5      estimate, and then indeed, as the Government has described,

6      he walks back into some hallway.  And the Court has this

7      material and you can see and assess, you know, how long

8      it's, you know -- he's back there, which is minimal, because

9      to me, again, in a truth is stranger than fiction but we're

10     stuck with what we're stuck with -- I mean, it's boring to

11     him.  He sees this is a hallway.  This is not part of where

12     people can see anything that is, you know, a pretty part of

13     the Capitol or something to take a picture of, and he

14     promptly exit- -- this is, like, an office.  I will go back

15     out here and take some more pictures.

16             It is at that juncture that he sees and hears

17     something -- and we don't, at this point, have the specific

18     details of, like -- of what was said, but someone says

19     something aggressive to an officer and the officer moves

20     away from that person quickly.  That is when he knew he was

21     not supposed to be there.  And another officer tells him at

22     -- right in that same time frame -- like, within seconds --

23     You are not supposed to be here.  You need to get out.  And

24     he promptly gets out.  Now, he spent some time.  He spent 20

25     minutes -- that is accurate information from the

1    Government -- in the Capitol building.  He was in there for

2    a short period of time after he saw something that caused

3    him concern, still looking around, but then he left.

4         So in our mind, that statement of facts that

5    supports, you know, what did you do, why are you pleading

6    guilty, reflected his shame over having participated -- and

7    he shouldn't have been there.  He wishes he had not been

8    there.  He knows he should not have been there.  He did not

9    know from the first moment his foot crossed, you know, into

10   the building that he was not supposed to be in there, but

11   there came a time while he was in the building when he

12   became certain he should not be in there.  He lingered,

13   albeit not for very long, and then he left.

14        So I want to, then, move forward and I think this,

15   kind of, dovetails into the interview with the FBI which is,

16   you know, again, to me, amazing work by the Government in an

17   inordinately complex case, you know, locating people, you

18   know?  They come and knock on his door after he had already

19   deleted these photographs.  And so I want to talk about

20   deleting those photographs because, you know, anytime you

21   see anything in a case where it looks like someone's trying

22   to eliminate potential evidence, it raises for me a red

23   flag.  You think, you know, that's, kind of, sneaky

24   behavior.  But, again, you know -- and I want you to hear it

25   from Mr. Pham -- he was -- when they got out of the building

1    after he had seen what he seen -- saw, he was still

2    processing it -- and I also want to make sure I'm not

3    minimizing, but yes, he was shouting things with the crowd

4    as he was going in.  He got caught up in the moment, and he

5    is very much ashamed of this.  Okay?  So I don't want to say

6    that didn't happen.  It did happen.

7              He leaves the building.  They're walking back to

8    their hotel.  They were actually still planning to go to

9    Arlington to -- which -- where -- was where they were

10   supposed to go after the speech.  They start hearing news

11   reports of people being hurt and that this had been a mob

12   and they're seeing the videos that we all started to see

13   which, from his perspective, he had not seen.  He didn't see

14   the destruction from his vantage point; he didn't see

15   anybody harmed, but he was seeing it now.  He later learned

16   that people died and he was devastated and he started

17   deleting at that time and he continued even when he got home

18   looking back at the pictures, say, I don't even want that

19   picture anymore, and deleting.  And in his mind, no doubt,

20   he was thinking, I have dishonored my department, which

21   eventually, as you'll read in -- I have more just broadly to

22   say about Mr. Pham, you know?  He would have been fired, no

23   doubt, for being charged with a federal offense, but it was

24   important for him to resign because he brought dishonor on

25   his department that he loved, which he did.  He resigned.

1     And he was -- prior to knowing that he was going to have to

2     do that because they were going to see him -- which they did

3     -- he was deleting things hoping they would not.  He did not

4     want to lose the career that he loved.  This is a man who

5     dreamed of being a police officer since he was a very little

6     boy.  And he came to this country without knowing a word of

7     English; he went to school; he learned the English; he got

8     to go to college; and then he got to hire on with the

9     department.  It was literally a dream come true.  Aside from

10     him being naturalized and ultimately, of course, you know,

11     the birth of his children and the marriage to his wonderful

12     wife, you know, that was one of the happiest days of his

13     life, much in contrast to knowing -- I mean, the shame of

14     this event began when he started seeing the news reports of

15     what was really happening and the full picture.  It was not

16     the being charged like many times we see, and I'll call them

17     crocodile tears; it was -- the crying started when the news

18     reports started and it hasn't stopped.  It's -- it is the

19     kind of thing that there is, you know -- obviously, the

20     Court's aims of sentencing have to take into account a

21     variety of factors, including, you know, stopping people

22     from doing whatever the type of crime is that the Court's

23     sentencing for and it's also to make sure the person who was

24     involved in the crime does not find his way into criminal

25     activity again in the future, and I can say with such

 1    clarity Mr. Pham will be -- he's never been a crusader of

 2    any kind, but he will be a crusader for kindness and peace.

 3            I had some notes that I wanted to write down.  And

 4    I think I've answered -- oh, I think I've answered all five

 5    of your questions.  I'd saved No. 1, but I think I

 6    interspersed No. 1, which was the question about the food,

 7    in the other answers.  As bizarre as it indeed sounds, it's

 8    just what it is.

 9            THE COURT:  Did he ever meet with anyone in

10    Arlington?

11            MS. HOCHGLAUBE:  I believe that he did and he, you

12    know -- he is still -- he actually has successfully started

13    sending out -- we're waiting on a -- we -- they have a huge

14    order and they have -- they already have a machine that

15    they're using to send out things, but they're waiting on

16    some of their product to come in on a container ship to make

17    the sausage.  So sign of the times.  But they are getting

18    orders.  He's opened a new space in Houston, and they

19    function as a "send it out across the country and the world"

20    business, not a local "sit down and dine" kind of a place.

21            THE COURT:  As far as -- just for ease of

22    reference, I guess it's the second point I --

23            MS. HOCHGLAUBE:  Yes.

24            THE COURT:  -- mentioned.  How, you know -- how do

25    you square what is in the Government's video exhibits with

1   the idea that he never saw officers stressed or threatened?

2   What -- I mean, that's a video he took.

3         MS. HOCHGLAUBE:  I agree, you know?  I --

4         THE COURT:  Just -- it's a matter of

5   interpretation?

6         MS. HOCHGLAUBE:  I think that it is.  And I, you

7   know -- I'm certain that you've watched this more than

8   anyone would care to stomach, but I would invite the Court

9   to -- after hearing from Mr. Pham, to look at it.  I think

10   sometimes seeing things in hindsight, you know, is a much

11   different feeling than seeing it at the present.   In

12   hindsight, it makes Mr. Pham want to vomit that he saw that

13   and did not just keep walking down the hill.  He walked down

14   the hill.  Unfortunately, he didn't stay.  He walked back up

15   the hill when he thought that they were gone.  In hindsight,

16   we have the same view.  In fact, Mr. Pham has the same view

17   that you did.  It just did not look that way to him at that

18   time.

19         THE COURT:  And do we have a factual dispute about

20   -- you talked about the deletion.  The issue of what he said

21   to the FBI that he initially denied and then they said, No,

22   no, no, they looked at him, and then he --

23         MS. HOCHGLAUBE:  Yeah.

24         THE COURT:  -- was truthful after that, we --

25   do -- we don't have a factual dispute --

1          MS. HOCHGLAUBE:  We don't have a factual dispute

2     about that.  He was, sort of, in a shame spiral and panic

3     and was not great; was, in the moment, childishly dealing

4     with the realities of what he had done.

5          THE COURT:  All right.

6          MS. HOCHGLAUBE:  And he's described it himself

7     that way as like a child and will answer your questions

8     likewise, you know?

9          The Government's concern is about, how can you

10    think these are small choices or what can we do as a

11    community or a justice community to make small choices not

12    seem small; right?  How can we warn a Mr. Pham in the future

13    you shouldn't do this because you might go to jail or you

14    might have some other consequence?  And to that, I would say

15    psychology is what psychology is.  I mean, we can't change

16    what some large group of people in the future will do in the

17    moment because other large groups of people around them are

18    doing that with one sentence, not to say that it's futile.

19    It is important to send messages, and we agree with that.

20    We are hopeful that his own efforts are sending a message.

21    He has started with nothing before, and he will start with

22    more than nothing but completely start over again.

23          A conservative man of faith, he, prior to this

24    day, ran a very conservative household and in terms of

25    disciplining of his children and how he handled family

1   business in a very planned and regimented way, and that also

2   has been obliterated, and it is on some levels a bad thing

3   and on some levels it's been a blessing.  The bad part of it

4   is the deep shame that he faces in front of the children

5   that he has wanted to raise to be, you know, the mentor --

6   the person who shows how to live a good, hardworking life,

7   you know?  He's taught them that you work hard every day,

8   you are good every day, and that good things will happen for

9   you because of that hard work, and he has shamed them.  He

10  has shamed his children.

11          And he has been talking with them since he got

12  home, but then when the arrest happened, it continued, and

13  there were days, because this was such a sensational

14  defendant, where the media camped out on his lawn, banged on

15  his door, banged on their windows, and his baby girl hid in

16  the closet for hours and wouldn't come out.  When she sees

17  him on the news, which does happen from time to time, she

18  goes back in the closet and he has to get her out of the

19  closet and talk about what daddy did is really wrong; that

20  what you do when you do something wrong is that you stand up

21  like a man or a woman and you take responsibility for it and

22  then you set out to do everything that you can to make it

23  right.

24          So when we talk about, what are the options for

25  the aims of sentencing, we want to make sure that the world

1   knows that there are consequences.  Well, his direct world

2   and his community knows that there are consequences, and he

3   teaches them every day how to deal with those consequences

4   and that you just do what you can to pick up the pieces to

5   salvage your reputation and move on, and he will be working

6   toward that for the rest of his life.  His family in Vietnam

7   has heard about this case through social media and they are

8   shamed.  And he has not once tried to say to any family

9   member or any community member -- and many community members

10  who are conservative and did want to say, You were somehow

11  doing the right thing, or, You were in the right place.  He

12  has said, No, this is wrong, I am guilty, and I will face

13  the consequences.

14        We believe that the aims of sentencing can be met.

15  He ended up going into custody on the day before

16  Inauguration Day which is not generally a federal court

17  holiday, but it turned out to be one for security reasons.

18  So he ended up having, I believe, two days in custody.  The

19  Court has multiple options before it in terms of sentencing

20  which we believe could send a message.  He, obviously, has a

21  conviction.  A jail time sentence of two days would also be

22  a sentence of time served potentially.  He will be paying

23  restitution.  There is an option that he could be on

24  probation and continue to demonstrate to the community what

25  it means to be a man who takes responsibility, and he will

 1    succeed if he's given that opportunity.

 2              He has so much work to do to repair the dishonor

 3    he has put upon his own name, his family's name, and the

 4    name of his community that he will not stop until the day

 5    that he dies working for kindness and good.

 6              We appreciate the time.  It's not often that a

 7    federal court spends such an enormous amount of time

 8    confronting a misdemeanor decision, and this is an

 9    incredibly unusual one and that is not lost on us.  We're

10    grateful for the time to be heard, and I'm looking forward

11    to Mr. Pham having the opportunity to talk to you directly.

12    And thank you, again.

13              THE COURT:  All right.

14              MS. HOCHGLAUBE:  Should I remain up here or should

15    I sit down?

16              THE COURT:  Yes, he may -- he -- if you would like

17    to be there as well, that's fine.

18              But --

19              MS. HOCHGLAUBE:  Okay.

20              THE COURT:  -- Mr. Pham, you have the right, if

21    you so choose, to make a statement or present any

22    information to mitigate the sentence that you would like.

23    So you can address me and address -- you've, obviously, been

24    here and heard all of our discussions.  So anything you

25    would like to say to me, I will hear from you now --

```
 1              THE DEFENDANT:  Yes, Your Honor.

 2              THE COURT:  -- sir.

 3              THE DEFENDANT:  I'm very nervous today.

 4              THE COURT:  Okay.

 5              THE DEFENDANT:  And I wrote my statement out.  I

 6    hope that you don't mind if I use it.

 7              THE COURT:  I -- whatever you're comfortable with,

 8    sir.

 9              THE DEFENDANT:  Thank you, Your Honor, for

10    allowing me this chance to say -- I would like to say I'm so

11    sorry for what I did.  I make the worst choice of my life.

12    My wife and I and a friend, we came to Washington to see the

13    city, to look into business opportunities in Arlington, and

14    to see the rally.  I didn't plan to go to the Capitol.  I

15    stupidly followed the crowd there.  I didn't see anyone

16    being violent, but I saw officer at the bike racks and a lot

17    of people yelling and screaming and stuff.  So I took some

18    videos and I think that's enough.  So I walked back down to

19    my wife.  So I was -- walked all the way down to the -- I

20    mean, all the way down.  I mean, at the loop.  And I heard

21    people yelling and screaming, Hey, the officer leaving.  The

22    officer leaving.  They are letting us in.  So I turn around

23    and I just walked back up and -- to the hill and I saw the

24    bike racks were no longer blocking the way and the officer

25    had left.  I wish I couldn't have gone further, but I did,
```

```
1    and I went inside and took photos.  I was excited that I was
2    inside the U.S. Capitol.  And then some officer told me,
3    Hey, you're not supposed to be here, and then I left.  I
4    have embarrassed myself the worst, my family in the U.S. and
5    in Vietnam.
6              (Brief pause.)
7              And that day -- the day I was in the news --
8              (Brief pause.)
9              I'm sorry.
10             My sister in Vietnam called and told me that, Hey,
11   the whole village know what you did.  That was stupid.  That
12   was embarrassing.  I destroyed my reputation, my career.  I
13   brought shame on my family, especially on my children.  I
14   was, you know, two years away from my retirement.  I
15   dishonored my department and I resigned.  I -- but I'm
16   already working to repair my reputation, ability to provide
17   for my family.  I always appreciate this country.  The U.S.
18   has given me so many opportunities.  I'm -- I know that I'm
19   very fortunate to be here.  And once again, I'm sorry.
20   Very, very sorry.
21             Thank you, Your Honor.
22             THE COURT:  All right.  You may return to your
23   seats.
24             MS. HOCHGLAUBE:  Thank you.
25             THE COURT:  Let me just ask, Ms. Prout, do you
```

```
 1    have anything to add in light of the defense allocution and
 2    Mr. Pham's statement?
 3              MS. PROUT:  No, Your Honor.
 4              THE COURT:  All right.  Anything further from the
 5    defense, then?
 6              MS. HOCHGLAUBE:  Nothing, Your Honor.  Thank you.
 7              THE COURT:  All right.  What I am going to do just
 8    because we've gone so long -- and I don't mind going long,
 9    especially since I loaded up the defense with all sorts of
10    questions that I wanted to answer, and so I'm sure that
11    chewed up a lot of time she wanted to spend talking about
12    the other positive aspects that the defendant -- of the
13    defendant's history and characteristics and other matters.
14    We're going to take a 10-minute recess and I will come back
15    and sentence the defendant.
16              THE DEPUTY CLERK:  All rise.  Court stands in
17    recess for 10 minutes.
18              (Brief recess taken.)
19              THE DEPUTY CLERK:  We're back on the record in
20    criminal matter 21-109, United States of America v. Tam Dinh
21    Pham.
22              THE COURT:  All right.
23              I have assessed the facts of this case in light of
24    the relevant 3553(a) factors, including the -- well, in this
25    case, not including the sentencing guidelines because they
```

1      don't apply, and I want to provide my thoughts for the

2      record, for Mr. Pham, for counsel, and everyone else about

3      my considerations in regard to the factors -- these factors

4      that I have to consider.

5              Let me start with the nature of the offense.

6              This is, in many ways, the hardest thing that I

7      and many of my colleagues have to grapple with in these

8      January 6th cases.  What happened that day was, in some

9      ways, as serious as an offense as there can be given that it

10     threatened the peaceful transfer of power from one president

11     to another.  The damage that was done on that day was both

12     tangible and intangible.  And, Mr. Pham, your role was very,

13     very minor on that day.  I agree.  I don't think there's any

14     -- the Government wouldn't dispute that.  But on the other

15     hand, without people like you, the collective force of the

16     mob that day would not have been the same.

17             And let me say a few things about the overall

18     January 6th event insofar as that is part of the nature and

19     circumstances of the offense here.

20             Mr. Pham, our Constitution and laws give you many

21     important rights that Americans fought and died for, and

22     people all around the world would give anything for those

23     rights to be recognized and to take root in their countries.

24     Maybe that's why your family came to the United States in

25     the first place.  To start with, you have the right to vote

1    for whoever you want for president.  You have the right to

2    speak out in favor of your candidate, put up yard signs, try

3    to convince your friends and neighbors to vote for him or

4    her.  If you don't like how an election is being conducted;

5    if you don't like your state or federal election laws, you

6    can speak out about those issues, too.  You can call; you

7    can write; you can try to meet with the local officials in

8    your state in Texas or in the Federal Government; and, of

9    course, you can engage in peaceful protest.  And if you

10   think you've been wronged and if you have a case, you can

11   file a lawsuit in state court or even here in federal court.

12   These rights, not just on paper, exercised by Americans

13   every day but -- not just on paper but as exercised by

14   Americans every day, empower you in a way that makes our

15   citizens the envy of the world, but freedom means that with

16   those rights also come responsibilities.  So what you cannot

17   do -- just cannot -- is join a mob that disrupts Congress's

18   ability to fulfill its role certifying the electoral vote

19   for president, a mob that used violence and the threat of

20   violence to try to accomplish its ends.

21           So what happened on January 6th was not only --

22   not only physically damaged property and hurt people,

23   although all that is bad enough; it harmed an important

24   American custom that helps support the broader rule of law

25   and the Constitution, and that day broke our tradition of

 1    peacefully transferring power which is among the most

 2    precious things we have as Americans.  It didn't honor the

 3    founders.  It was the kind of thing they wrote the

 4    Constitution to prevent.  It was a national disgrace, and

 5    you played admittedly a very small role, but a role

 6    nonetheless, in that.  And you did have a limited role.  The

 7    parties agree here, you weren't part of any group that

 8    organized anything on that day; there's no evidence

 9    whatsoever that you planned anything that happened that day;

10    there's no evidence that you engaged in any kind of

11    violence; that you -- no evidence that you destroyed any

12    property, carried a weapon that day.  The amount of time you

13    were in the Capitol was -- I don't know -- I think it's

14    relatively modest.  And you took early responsibility by

15    pleading guilty, and you get credit for that, as you should.

16              But I think there's also evidence before me that

17    you were more invested in the mob's actions that day than

18    you have let on -- and I'll go into it a little bit more --

19    and that you really haven't taken full responsibility for

20    all the decisions you made that day.  And I have to weigh

21    this, too.  You agreed under oath that when you entered the

22    Capitol, you knew you didn't have permission.  Now, you've

23    backtracked somewhat, and even if it's not a backtrack, what

24    you told me here today and what your attorney argued to me

25    was that you didn't really know you didn't have permission

1   to be in the Capitol until someone -- an officer in there --

2   once you were in there, someone informed you of that, an

3   officer did or you saw an interaction between an individual

4   and an officer that made you realize, Wait a minute.  I'm

5   not supposed to be here.

6           But I think, you know, given your job as a police

7   officer; given the training, including experience managing

8   large crowds or preparing for the potential to manage large

9   crowds; and the video evidence I -- it -- the video exhibits

10  I've seen; and the fact that you had to have passed barriers

11  and fences, even if you didn't step over them -- which I

12  think is a fair distinction to make -- you had to have

13  passed those things on your way to the Capitol itself.  I

14  just don't think it's credible that you didn't know when you

15  walked into that Capitol building that you shouldn't have

16  been there.  And, you know, in the sentencing papers, you

17  claimed that you'd never seen an officer under stress or

18  threatened that day which I think is also not credible for

19  those same reasons.

20          And in a broader way, I think you've attempted to

21  portray yourself as someone who was really not interested in

22  what was happening there at the Capitol.  And, maybe, that

23  is true to a degree -- to some degree.  I mean, I -- this, I

24  guess, isn't a yes or no question.  It's more of a spectrum.

25  Maybe your -- maybe, in the grand scheme of people present,

1    you weren't as interested as other people, but you were

2    chanting stop the steal.  You did say excitely with a smile

3    on your face that you were part of a group that was taking

4    back the house.  You did pose for photos both outside the

5    Capitol and inside in a way that suggests you were excited

6    and happy and celebrating something.  So I just think the

7    explanation you've offered for, kind of, how you wound up

8    there and what your interest in what was happening there was

9    not -- does not fully -- is not fully and wholly truthful.

10          You also tried to delete photos that would show

11   your involvement.  Again, I think you downplayed this to

12   some degree, saying it was in part to protect your own

13   exposure to prosecution -- I'm sorry, you've downplayed that

14   this was in part -- at least in part to protect your own

15   exposure to prosecution as opposed to just a -- to just --

16   to -- for embarrassment for your employer which, of course,

17   it surely was, but, again, I don't think it's credible at

18   all, given your job as a police officer for 18 years, that

19   what partly wasn't what -- going through your mind at least

20   in part was that you were trying to hide conduct that could

21   have -- that could expose you to criminal liability.

22          So that's the good news and the bad news of the

23   circumstances of the offense.  In the grand scheme of this

24   offense, surely, your conduct is among the least severe, no

25   question, but there are some other reasons there where I

1    think I have to look at it as a mixed bag and I can't fully

2    credit you for taking all the responsibility that you could.

3              Turning to your characteristics as an offender,

4    this is a good news story, Mr. Pham.  Obviously, you have no

5    criminal history.  You -- and I guess I should point out,

6    we've focused so much on that one day here because that's

7    what the -- our proceeding is about here, but, Mr. Pham,

8    I've got to tell you, I recognize that nobody is only who

9    they are on their worst day.  And, as I said, you have no

10   criminal history, quite obviously.  You -- I've read all the

11   letters that portray you as a dedicated son, husband,

12   father, and faithful friend who has helped people through

13   rough patches in their lives.  That's part of the story.

14   That's important.  I think your immigrant story is

15   inspiring, and I have no doubt you love this country, not

16   one bit.  I have no doubt about that at all.  And your

17   service as a police officer for 18 years is, again,

18   something -- a positive in your column here, but it cuts

19   both ways to some degree because it also -- your service and

20   experience as a police officer also calls into question the

21   credibility of some of the explanations you've given for

22   your conduct that day.  It also means that, in taking the

23   actions that you did, you violated your sworn duties to

24   uphold the law in a way that other defendants did not.  And

25   as, I think, the Government rightly argues, the fact that

1     you participated in the events of January 6th gave those

2     events an air of legitimacy that they might not otherwise

3     have had.  So again, I think, you know, in comparison to

4     many defendants I have in front of me, quite obviously, you

5     have -- through your employment and through the other things

6     I have in front of me, you have a very -- you've -- by and

7     large, other than that day as far as I can tell, have lived

8     a very -- an exemplary life, and that carries a lot of

9     weight, too.

10             The next factor I -- is, though, that I have to

11    consider the seriousness of the offense; the respect --

12    promote respect for the law; I have to consider just

13    punishment for the offense; and the sentence should also

14    afford adequate deterrence to criminal conduct, protect the

15    public from future crimes of the defendant, and promote

16    rehabilitation.

17             I'm not worried about protecting the public from

18    future crimes of you, Mr. Pham -- future crimes that you may

19    commit, and I don't think rehabilitation is a large issue

20    either.  Obviously, deterrence is a big issue.  Again, not,

21    maybe, specific deterrence as to you, but general deterrence

22    regarding January 6th and events like January 6th.  And I do

23    think that I've got to weigh the fact that what happened

24    that day was a very serious event that simply we cannot

25    allow to be repeated.

1          I've got to consider the types of sentences

2     available.  We -- I went through those earlier when we

3     talked about what the statute here at issue -- what the

4     statute permits me to do.  And I've got to consider unwanted

5     sentence disparities.  Normally, in many ways, that would be

6     handled by me considering the guidelines, but in a case like

7     this where the guidelines don't apply, obviously, I don't

8     consult the guidelines.  What I do have and what I have

9     considered carefully is -- both because I've tried to track

10    them, but also the Government has, in their appendix, laid

11    out a lot of the cases that have been sentenced -- January

12    6th cases that have been sentenced so far, and I've

13    certainly considered those.  I also have to consider the

14    need to provide restitution.  And, of course, in this case,

15    the parties have agreed on a restitution amount of $500.

16         So you know, in summary, Mr. Pham, I strongly

17    considered giving you probation.  In the grand scheme of

18    things, you did not have a major role in what happened on

19    January 6th and, as I mentioned earlier, you already

20    suffered the loss of your job which was a significant blow,

21    including a financial blow insofar as, I assume, because you

22    left when you did, you lost your shot at a pension as well,

23    but -- and you get credit for all of that, and you get

24    credit for taking -- for pleading guilty early, and early in

25    the grand scheme of all these cases.  You get credit for

 1    that, and I give you credit for that.  But on the other

 2    hand, I think, especially for someone who was a sworn law

 3    enforcement officer, I have to consider the way in which I

 4    think you've downplayed your actions that day in a number of

 5    ways that I've already gone through that I don't find

 6    credible, and I think that erodes some of the credit that I

 7    might otherwise have given you for taking full

 8    responsibility.  So I am going to sentence you to 45 days of

 9    incarceration, $500 in restitution, and a $1,000 fine.

10            If you will stand, sir.

11            MS. HOCHGLAUBE:  Judge, may that be served under

12    house arrest?

13            THE COURT:  It may not.  And he'll also be able

14    to --

15            Sir, you may stand.  Please stand.  Correct.

16            And the other thing I'll mention is he'll be able

17    to report as directed by Pretrial or -- I mean, obviously,

18    he's not going to be taken into custody here today.  He'll

19    be able to report as directed by Probation or Pretrial to

20    serve that out.  And I, you know -- I strongly -- I guess I

21    should say for the record, to your point about home

22    incarceration, you know, that has been a sentence that many

23    folks have been given in these cases and that I've also

24    handed down in a case -- that is, home detention as part of

25    probation -- but I have chosen not to sentence Mr. Pham in

1    that way.

2          So I will now impose the sentence which I

3    conclude, after considering all the 3553(a) factors, is

4    sufficient but not greater than necessary to comply with the

5    purposes of sentencing.

6          Pursuant to the Sentencing Reform Act of 1984 and

7    in consideration of the provisions of 18 United States Code

8    Section 3553, it is the judgment of the Court that you, Tam

9    Dinh Pham, are hereby committed to the custody of the Bureau

10   of Prisons for a period of 45 days on Count 4.  In addition,

11   you are ordered to pay a special assessment of $10 in

12   accordance with 18 United States Code Section 3013.  As I

13   mentioned earlier, you will be permitted to surrender as

14   notified by Pretrial Services or Probation, whoever will

15   make that notification.  You are also ordered to pay a fine

16   in the amount of $1,000.  And having assessed your ability

17   to pay, a payment of the total criminal monetary penalties

18   is due as follows: payment in monthly installments of $100

19   to commence 30 days after the date of this judgment.  You

20   must provide the probation officer access to any requested

21   financial information and authorize the release of any

22   financial information.  The Probation Office may share the

23   financial information with the U.S. Attorney's Office.  And,

24   as the parties have agreed to, you are also ordered to make

25   restitution in the amount of $500 to the Architect of the

1    Capitol.  I have determined that you do not have the ability

2    to pay interest and, therefore, I waive any interest or

3    penalties that may accrue on the balance.

4         Restitution payments shall be made to the Clerk of

5    the Court for the United States District Court, District of

6    Columbia, for disbursement to the following victim: the

7    victim name, Architect of the Capitol, Office of the Chief

8    Financial Officer, attention: Kathy Sherrill, CPA, the Ford

9    House Office Building, Room H2-205B, Washington, D.C. 20515.

10   The amount of loss is $500.  And those financial obligations

11   are immediately payable to the Clerk of Court for the U.S.

12   District Court, 333 Constitution Avenue, NW, Washington,

13   D.C. 20001.  Within 30 days of any change of address, you

14   shall notify the Clerk of Court of the change until such

15   time as the financial obligation is paid in full.

16        The Probation Office shall release the presentence

17   investigation report to all appropriate agencies which

18   includes the United States Probation Office in order to

19   execute the sentence of the Court.

20        Pursuant to 18 United States Code 3742, you have a

21   right to appeal the sentence imposed by this Court if the

22   period of imprisonment is longer than the statutory maximum.

23   If you choose to appeal, you must file any appeal within 14

24   days after the Court enters judgment.

25        And, as defined in 18 United States Code Section

1    2255, you also have the right to challenge the conviction

2    entered or the sentence imposed if new and un- -- currently

3    unavailable information becomes available to you or on a

4    claim that you received ineffective assistance of counsel in

5    entering the plea of guilty to the offense of conviction or

6    in connection with sentencing.

7              And if you are unable to afford the costs of an

8    appeal, you may request permission from the Court to file an

9    appeal without costs to you.

10             Finally, pursuant to the D.C. Circuit opinion in

11   United States v. Hunter, 809 F.3d 677, decided on January

12   12th, 2016, are there any objections to the sentence imposed

13   that are not already noted on the record?

14             From the Government?

15             MS. PROUT:  Not for the Government, Your Honor.

16             THE COURT:  From the defense?

17             MS. HOCHGLAUBE:  There are none, Your Honor.  We

18   would ask that he be credited with what we believe are two

19   days from detention.

20             THE COURT:  I believe I don't order that, but it's

21   certainly my expectation that -- I'll put on the record,

22   it's certainly my expectation that he would get credit for

23   any amount of time he has already served.  Absolutely.

24             Mr. Pham, just before I say -- before we move to

25   some other things that aren't so interesting, I meant what I

1    said before about how we're not who we are -- the sum total

2    of our lives is not who we are on our worst days, and I have

3    no doubt that you are going to -- as I said, I have no doubt

4    for your love of this country.  And I wish you all the luck

5    as you go forward with taking on a new career challenge,

6    given that you had to move on from your prior job.  And I

7    have no doubt, as you expressed to me, your interest in

8    making amends for this toward your community and toward your

9    family in terms of setting a good example.  I don't -- I

10   have every confidence you'll be able to do that, sir, and I

11   wish you good luck in doing it.

12              Is the Government -- is the -- does -- do I have a

13   motion from the Government?

14              MS. PROUT:  Yes, Your Honor.  The Government does

15   move to dismiss Counts 1 through 3 of the information

16   pursuant to the --

17              THE COURT:  All right.

18              MS. PROUT:  -- plea agreement.

19              THE COURT:  Actually, can you -- could you take

20   your --

21              MS. PROUT:  I'm sorry, Your Honor.

22              THE COURT:  -- mask off, Ms. Prout, and I say that

23   only because I don't know if -- I could barely hear, but I

24   don't know if the court reporter could.

25              MS. PROUT:  I have always got a volume problem.  I

1    apologize.

2              THE COURT:  All right.

3              MS. PROUT:  The Government does move to dismiss

4    Counts 1 through 3 of the information, Your Honor.

5              THE COURT:  All right.  And that motion, of

6    course, will be granted.

7              Is there anything else the Government thinks I

8    need to address here today?

9              MS. PROUT:  Just as a housekeeping matter, Your

10   Honor, I neglected to officially move for the admission of

11   Government's Exhibits 1 through 4, and I would do so now.

12             THE COURT:  All right.  Any objection?

13             MS. HOCHGLAUBE:  We have no objection.

14             THE COURT:  All right.  They will be admitted.

15             MS. PROUT:  Thank you, Your Honor.

16             THE COURT:  All right.  Anything further from the

17   defense?

18             MS. HOCHGLAUBE:  And likewise, our sentencing

19   memorandum contained exhibits which I know the Court has

20   reviewed.  So we would also assume that those would be part

21   of the record.

22             THE COURT:  Any objection?

23             MS. PROUT:  None, Your Honor.

24             THE COURT:  All right.  They will, of course, be

25   admitted.

1          MS. HOCHGLAUBE:  Two small things.  One, if

2     possible, and I know some courts do and some courts don't,

3     but we would request that he serve his 45 days close to the

4     Houston area.

5          THE COURT:  Well, I will -- what -- again, my

6     understanding -- at least the practice in this District is

7     to make a recommendation.  And so what I would say on the

8     record right now is I will recommend that he serve that as

9     close to Houston, Texas, as possible.  If there is -- and

10    I'll say this.  Of course, that doesn't account for other

11    things that the Bureau of Prisons might want to take into

12    account in terms of the -- obviously, the level of -- the

13    nature of the facility.  So if you all -- I will probably

14    not enter this order for a few days.  If you think of a

15    facility that you would like to -- me to -- the defense

16    would like me to include on the judgment and commitment

17    order that lays out -- that is more specific and you'd like

18    me to recommend a particular facility, I can -- I will do

19    that.  I don't -- again, I don't have the ability to, as you

20    may know, tell the BOP where to put him, but I can

21    recommend, and I will recommend whatever you would like me

22    to recommend.

23          MS. HOCHGLAUBE:  We would recommend FCI Bastrop,

24    if that would be acceptable.

25          THE COURT:  There it is.  So can you spell that

1    for me, Ms. --

2              MS. HOCHGLAUBE:  Sure.  It's B-A-S-T-R-O-P.

3              THE COURT:  All right.  And is that in Houston or

4    is it nearby?

5              MS. HOCHGLAUBE:  It is in the Houston area.

6              THE COURT:  All right.  Well, then, I'll do that.

7    I'll recommend that facility.

8              MS. HOCHGLAUBE:  Thank you, Your Honor.

9              And then finally, at the detention hearing,

10   Mr. Pham's passports were collected by the court and,

11   certainly, just at the conclusion of the sentence, we would

12   ask that he could just pick them up from the court registry.

13             THE COURT:  I don't see any reason why he won't be

14   able to do that.  If there's a problem, you know where to

15   find me, but he'll get his passport back promptly, for sure.

16             MS. HOCHGLAUBE:  Thank you, Your Honor.

17             THE COURT:  And the other thing I think I

18   mentioned, the motion we talked about earlier that I'll --

19   when do you think -- how long do you think it will take you

20   to -- I just want to get a date on the calendar so it

21   doesn't, you know, get lost in oblivion.

22             MS. HOCHGLAUBE:  Sure.  I hope to have something

23   on file by Monday.

24             THE COURT:  Oh.  That quickly?  All right.

25             MS. HOCHGLAUBE:  Yes, Monday afternoon, but --

1          THE COURT:  Very -- then that's fine.

2          And then the Government can just respond under the

3     rules.  That's fine.

4          MS. PROUT:  Yes, Your Honor.  We will.

5          THE COURT:  All right.  Very well.

6          Good luck, Mr. Pham.

7          Until -- I'll look for that motion.  The parties

8     are dismissed.

9          MS. HOCHGLAUBE:  Thank you, Your Honor.

10          MS. PROUT:  Thank you, Your Honor.

11          THE DEPUTY CLERK:  All rise.  This Honorable Court

12     is adjourned.

13          (Proceedings concluded at 12:46 p.m.)

14                    * * * * * * * * * * * *

15          **CERTIFICATE OF OFFICIAL COURT REPORTER**

16     **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

17     **that the above and foregoing constitutes a true and accurate**

18     **transcript of my stenographic notes and is a full, true and**

19     **complete transcript of the proceedings to the best of my**

20     **ability, dated this 24th day of December 2021.**

21                              **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                                 **Official Court Reporter**
22                              **United States Courthouse**
                                 **Room 6722**
23                              **333 Constitution Avenue, NW**
                                 **Washington, DC 20001**

24

25